# ORIGINAL

J. Stephen Simms (*pro hac vice* pending)
Simms Showers LLP
jssimms@simmsshowers.com
201 International Circle, Suite 250
Baltimore, Maryland  21030
Telephone:   410-783-5795
Facsimile:    410-510-1789

Lead Counsel

Gary R. Clouse (Bar No. 111055)
gclouse@icclawfirm.com
ISAACS, CLOUSE, CROSE & OXFORD, LLP
401 Wilshire Boulevard
12th Floor Penthouse
Santa Monica, California 90401
Telephone:   310-458-3860
Facsimile:    310-395-9880

Local Counsel

Attorneys for Intervening Plaintiff
Ocean Energy Ltd.



## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TMF TRUSTEE LIMITED, | |
| Plaintiff, | Case No. 2:17-cv-09010-PA-AGR |
| vs. | |
| M/T MEGACORE PHILOMENA, its engines, boilers, tackles, and other appurtenances, etc., *et al*, | OCEAN ENERGY VERIFIED INTERVENING COMPLAINT FOR ARREST OF VESSEL IN REM (SUPPLEMENTAL RULE C), ARREST OF OCEAN ENERGY MGO (SUPPLEMENTAL RULE D) |
| Defendant *in rem*, and | AND ISSUE OF WRITS OF |

VERIFIED INTERVENING COMPLAINT – 1

| | |
|---|---|
| HURRICANE NAVIGATION INC.,<br><br>   Defendant *in personam*.<br>_____<br><br>OCEAN ENERGY LTD.,<br><br>   Intervening Plaintiff,<br><br>vs.<br><br>M/T MEGACORE PHILOMENA, its<br>engines, boilers, tackles, and<br>other appurtenances, etc. *et al.*,<br><br>The Marine Gas Oil ("MGO") Aboard<br>the M/T MEGACORE PHILOMENA<br>provided by OCEAN ENERGY LTD.,<br><br>   Defendants  *in rem*, and<br><br>OXYGEN MARITIME<br>MANAGEMENT, INC.<br><br>HURRICANE NAVIGATION INC.,<br><br>   Defendants *in personam,* and<br><br>THE MASTER OF THE M/T<br>MEGACORE PHILOMENA<br><br>   Garnishee.<br>_____ | MARITIME ATTACHMENT AND<br>GARNISHMENT (SUPPLEMENTAL<br>RULE B) |

Ocean Energy Ltd. ("Ocean Energy") brings this action against defendant *in rem* M/T MEGACORE PHILOMENA, its engines, boilers, tackles, and other

VERIFIED INTERVENING COMPLAINT – 2

appurtenances, etc. *et al.* (the "Vessel"), pursuant to Supplemental Rule C for Certain Admiralty and Maritime Claims, against the Marine Gas Oil ("MGO") Aboard the Vessel which was provided by Ocean Energy ("the Ocean Energy MGO"), pursuant to Supplemental Rule D for Certain Admiralty and Maritime Claims, and against Oxygen Maritime Management, Inc. ("Oxygen") and Hurricane Navigation, Inc. ("Hurricane") *quasi in rem* pursuant to pursuant to Supplemental Rule B for Certain Admiralty and Maritime Claims, and states further as follows:

## PARTIES AND JURISDICTION

1.      Ocean Energy is a St. Vincent corporation and provided MGO to the Vessel at New Orleans on or about November 14, 2017, as stated herein.

2.      The Vessel is an ocean-going oil and liquids tanker, which is presently arrested in this District and in this action.

3.      The Ocean Energy MGO is certain marine gas oil which Ocean Energy provided to the Vessel at New Orleans, which has not been consumed, remains aboard the Vessel and to which Ocean Energy holds title.

4.      Oxygen is the disponent (ultimate) owner of the Vessel and of Hurricane, and directly or through agents ordered the MGO which Ocean Energy provided to the Vessel.  Hurricane is the record owner of the Vessel and directly or through agents, including Oxygen, ordered the MGO which Ocean Energy

provided to the Vessel.  Neither Oxygen nor Hurricane are found in this District within the meaning of Supplemental Rule B.

5.      This is a case of admiralty and maritime jurisdiction and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.  The Court has subject matter jurisdiction. This Court has jurisdiction pursuant to 28 U.S.C. § 1333.

6.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

### Count I: *In Rem* Against the Vessel (Rule C)

7.      Ocean Energy repeats the foregoing paragraphs.

8.      Ocean Energy brings this action to recover amounts indisputably due and owing to it under a maritime contract between it and Oxygen and Hurricane, for Ocean Energy's provision of MGO to the Vessel.

9.      The Sales Confirmation between Ocean Energy and Oxygen and Hurricane (**Exhibit A** hereto) confirms that Ocean Energy's Sales Terms (**Exhibit B** hereto) control.

10.     On November 14, 2017, Ocean Energy provided 668 metric tons of MGO to the Vessel at the Port of New Orleans.

11.     The Vessel's Master and/or Chief Engineer and/or designated Officer received the MGO provided by Ocean Energy's and acknowledged receipt by signing the bunker delivery note (in, **Exhibit C** hereto).

VERIFIED INTERVENING COMPLAINT  – 4

12.     Ocean Energy Sales Terms confirm that through its provision of the MGO to the Vessel, Ocean Energy holds a maritime lien *in rem* against the Vessel to secure payment to Ocean Energy for the MGO.

13.     The MGO which Ocean Energy provided to the Vessel is and was a maritime necessary within the meaning of 46 U.S.C. § 31301(4).

14.     Ocean Energy provided this necessary to the Vessel on the order of Oxygen and Hurricane, the owners and managers of the Vessel and persons authorized by the owner within the meaning of 46 U.S.C. § 31342.

15.     Ocean Energy invoiced the Vessel and Oxygen and Hurricane for the MGO, in the agreed amount of USD 100,246.99 (**Exhibit C** hereto).

16.     Despite demand, Ocean Energy has never been paid its invoiced amount.

17.     Ocean Energy demands relief as set out below.

### Count II: *In Rem* Against the Ocean Energy MGO (Rule D)

18.     Ocean Energy repeats the foregoing paragraphs.

19.     Ocean Energy's Sales Terms provide that Ocean Energy continues to hold title to all of the MGO until it is paid for.

20.     Ocean Energy was not paid for the MGO and believes that some or perhaps all of the Ocean Energy MGO remains aboard the Vessel.

21.     Ocean Energy therefore seeks to arrest the Ocean Energy MGO pursuant to Rule D, to try title to the Ocean  Energy MGO.

22.     Ocean Energy demands relief as set out below.

## Count III: *Quasi In Rem* Against Oxygen and Hurricane (Rule B)

23.     Ocean Energy repeats the foregoing paragraphs.

24.     Both Oxygen and Hurricane are liable *in personam* to Ocean Energy for breaching their contract with Ocean Energy for MGO for the Vessel, which MGO Ocean Energy provided to the Vessel.

25.     Further, Ocean Energy's Sales Terms, provide that Oxygen and Hurricane must pay Ocean Energy's attorneys fees and costs for recovery from the breach of contract.

26.     Ocean Energy seeks issue of process of maritime attachment and garnishment so that it may obtain security for its claims, including its contractual attorneys' fees and costs.

27.     No security for Ocean Energy's claims has been posted by Oxygen and Hurricane or anyone acting on their behalf to date.

28.     Oxygen and Hurricane cannot be found within this District within the meaning of Rule B, but is believed to have, or will have during the pendency of this action, property and/or assets in this jurisdiction consisting of the Vessel and

other property, including marine fuel, cash and/or credits in the hands of Garnishee in this District.

29.     The Court should therefore issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Supplemental Rule B, attaching all tangible or intangible property or any funds held by the Garnishee on behalf of, for the benefit of, and/or for the account of Defendants, up to the amount of at least the amount demanded herein to secure Ocean Energy's claim, and that all persons claiming any interest in the same be cited to appear and, pursuant to Supplemental Rule B, answer the matters alleged in this Verified Intervening Complaint.

30.     Ocean Energy demands relief as set out below.

WHEREFORE, Ocean Energy demands judgment and relief as follows:

A.     **Count I: *In Rem* Against the Vessel (Rule C)**:  That a Warrant of Arrest be issued, and that this Court direct the United States Marshal to arrest the Vessel, as well as its tackle and apparel, requiring the Vessel to answer the allegations contained herein; and

1.     That process of arrest, in due form of law, according to the course and practice of this Court in causes of Admiralty and Maritime Jurisdiction within the meaning of the Constitution of the United States and Fed. R. Civ. P. 9(h), be issued against the Vessel, its engines, machinery and

appurtenances, etc., and all other necessaries and equipment belonging and appurtenant thereto, as provided in Supplemental Rule C; and

2.    That all persons claiming any interest in the Vessel be cited to appear and answer the matters aforesaid, and that the Vessel, its engines, machinery and appurtenances, etc., and all other necessaries and equipment belonging and appurtenant thereto, may be seized, condemned and sold to pay the demands and claims aforesaid, with interest, costs and attorney's fees; and

3.    That after due proceedings had, Ocean Energy's maritime liens resulting from the said provision of MGO be recognized as the paramount liens against the Vessel, superior to the claims and interests of all others, and that the said Vessel be condemned and sold to pay Ocean Energy's claims, together with interest and costs; and

4.    That Ocean Energy may become purchaser at any sale of the Vessel by bidding the amount of its claim; and

5.    That the amount claimed herein, together with all amounts required to be disbursed for the case and preservation of, movement of if necessary, and insurance on the Vessel, and all costs be taxed as costs against the Vessel; and

6.    That it be declared that any and all persons, firms or

VERIFIED INTERVENING COMPLAINT – 8

corporations and all others claiming any interest in the Vessel are forever barred and foreclosed from all rights or equity of redemption or claim in and to the Vessel and every part thereof; and

7.     That after due proceedings, judgment be entered in favor of Ocean Energy and against the Vessel, *in rem*, recognizing Ocean Energy's maritime lien, and for judgment *in rem* in the amount of at least USD 100,246.99, plus prejudgment interest, costs and other and further proper relief.

B.     **Count II: *In Rem* Against the Ocean Energy MGO (Rule D)**:  That a Warrant of Arrest pursuant to Rule D issued, and that this Court direct the United States Marshal to arrest the Ocean Energy MGO; and

1.     That all persons claiming any interest in the Ocean Energy MGO be cited to appear and answer the matters aforesaid; and

2.     That after due proceedings had, this Court declare that Ocean Energy holds title to the Ocean Energy MGO superior to the claims and interests of all others; and

4.     That the Ocean Energy MGO shall be returned to Ocean Energy or, at the option of Ocean Energy sold or transferred to a party according to terms of Ocean Energy's choice.

C.     **Count III: *Quasi In Rem* Against Oxygen and Hurricane (Rule B)**:

That process in due form of law issue against Defendants Oxygen and Hurricane, citing each to appear and answer under oath all and singular the matters alleged in the Verified Complaint; and:

1.      That since Oxygen and Hurricane cannot be found within this District pursuant to Rule B, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching all of Oxygen's and Hurricane's tangible or intangible property or any other funds held by Garnishee, , up to the amount of at least USD 100,246.99 , contractual interest, attorneys fees and costs further of at least $60,000 (total, USD 160,246.99) to secure Ocean Energy's claims, and that all persons claiming any interest in the same be cited to appear and, pursuant to Rule B, answer the matters alleged in the Verified Complaint; and

2.      That judgment be entered for Ocean Energy and against Oxygen and Hurricane in the amount of at least USD 100,246.99, plus contractual interest, attorneys fees and costs, prejudgment interest, other and further proper relief; and

D.      That this Court order and enter judgment in favor of Ocean Energy all other further and proper relief.

Dated: February 8, 2018.

VERIFIED INTERVENING COMPLAINT  – 10

Simms Showers LLP
J. Stephen Simms
(*pro hac vice* pending)
jssimms@simmsshowers.com
201 International Circle, Suite 250
Baltimore, Maryland 21030
Telephone:   410-783-5795
Facsimile:   410-510-1789

Gary R. Clouse (Bar No. 111055)
gclouse@icclawfirm.com
ISAACS, CLOUSE, CROSE &
OXFORD, LLP
401 Wilshire Boulevard
12th Floor Penthouse
Santa Monica, California 90401
Telephone:   310-458-3860
Facsimile:   310-395-9880

Ocean Energy Counsel

## VERIFICATION OF INTERVENING COMPLAINT

Pursuant to 28 U.S.C. § 1746, J. Stephen Simms declares under the penalty of perjury:

1.      I am a Principal of the law firm Simms Showers LLP, counsel for Ocean Energy.

3.      I have read the foregoing Verified Intervening Complaint and know the contents thereof.

4.      I believe the matters to be true based on documents and information obtained from employees and representatives of Ocean Energy.

5.      The reason that this verification was made by deponent and not by the Ocean Energy is because Ocean Energy is a foreign corporation, whose officers are not in this District.   Ocean Energy authorizes me to make this affidavit.

VERIFIED INTERVENING COMPLAINT – 11

6.     I further verify that Defendants Oxygen and Hurricane cannot be found within this District within the meaning of Supplemental Rule B, specifically, that, these defendants cannot be served with the summons and complaint as provided in F.R.Civ.P. 4(e)(2) or 4(h)(1).  I state that on behalf of Ocean Energy, an electronic records search for Oxygen and/or Hurricane was completed in the records of the California Secretary of State, Corporate Division, finding no resident agent or corporate registration for Oxygen and/or Hurricane in this District, and that according to Directory Assistance there is no telephone listing for  Oxygen and/or Hurricane within any area code in this District.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 8, 2018.

J. Stephen Simms

VERIFIED INTERVENING COMPLAINT – 12



OCEAN ENERGY (HELLAS) LTD
2 Lalechou str., & Kiffisias ave,
154 51 Neo Psychiko
Athens - Greece
Phone : +30 210 429 2781 - Fax : +30 210 429 2165
E-mail: greece@oceanenergy.mc
Web site : www.oceanenergy.mc

**ORDER CONFIRMATION dtd 10/11/2017**

To: OXYGEN MARITIME MANAGEMENT INC
Att: Mrs Anna-Maria Kalopisi

Acting as contractual Sellers and following nomination received from you,
we are pleased to confirm that we shall supply:

Buyer: "OXYGEN MARITIME MANAGEMENT INC " and/or Master and/or Owners
and/or Charterers and/or Subcharterers and/or Managers
and/or Operators and/or Agents of vessel M/V "MEGACORE PHILOMENA (IMO: 9456915)"
and/or any other party identified as Buyer according to our Seller Standard
Terms and Conditions.

Seller: "Ocean Energy LTD"
Trust House 112, Bonadie Street, Kingstown, St Vincent

Vessel: M/V MEGACORE PHILOMENA (IMO: 9456915)
Port: NEW ORLEANS
ETA: Already there - ETD: 09/Nov/17

Product 1: lsmgo dma 0,1 (API 36)
Quantity: 150 – Mts
Price: USD 668 /mtd - Delivered by barge

Agents: RILEY SHERMAN SHIPPING TEXAS

Physical: CUSTOM FUEL NOLA MGO

Payment: 30 Days from Delivery Date (Delivery Date to count as day 1) by



1

Telegraphic Transfer in same day funds at Seller's designated bank account
against digital of fax copy of the invoice in US Dollars without deductions,
set-off or counterclaim.
- Late receipt of funds will incur an interest charge of 2% per month pro-rated
on a daily basis and compounded from the due date until receipt by the Seller of
sufficient cleared funds.
- Where due date falls on a weekend or public holiday, payment is due no later
than the preceding banking day.

Terms: In addition to the Terms and Conditions stated in this confirmation, this
contract is made subject to the Sellers Standard Terms and Conditions for the Sale
of Marine Bunker Fuels, Lubricants and Other Products, including their provisions
at clause 22 about law and jurisdiction, which, if not already in your possession,
can be obtained and read online using the following link www.oceanenergy.mc/terms
or by requesting a copy by sending an email to oceanenergy@oceanenergy.mc or by
contacting any of our offices.

- Where Seller is not also the Physical Supplier, the terms and conditions which
apply between Seller and Physical Supplier will be available on request and will
be in any case deemed incorporated into these terms and conditions for the benefit
of Ocean Energy in so far as they further limit the liability of the Physical Supplier/
Seller/or provide more protection and / or grant more security to the Physical Supplier/
Seller for the payment of the supply.
- Weights valid as per bunker / custom certificate.
- Overtime, local taxes, extra charges if any to be for vessel's account.
- Please instruct Vessel's appointed agent to coordinate closely with supplier to
ensure smooth delivery.
- Any errors or omissions in the present Confirmation should be reported immediately.

Thanks and best regards.
Alex Sianos // Skype id : alex.sianos // mobile : +306932244034
OCEAN ENERGY
10/11/2017

---

This message and any attachments (if any) is intended solely for the addressees and is strictly confidential. If you receive this message by error, please delete it and immediately
notify the sender. Any use not in accord, any dissemination or disclosure, either whole or partial, is formally prohibited except formal approval by sender. The internet can not
guarantee the integrity of this message, Ocean Energy Ltd as subsidiaries, shall (will ) not therefore be liable for the message if this last modified.

Ce message et toutes les pièces jointes (si existantes) est établi à l'intention exclusive de ses destinataires et sont strictement confidentiels. Si vous recevez ce message par
erreur, merci de le détruire et d'en avertir immédiatement l'expéditeur. Toute utilisation non-conforme, toute diffusion ou toute publication totale ou partielle de ce message
est strictement et formellement interdit sauf autorisation expresse de l'expéditeur. L'internet ne permettant pas d'assurer l'intégrité de ce message, Ocean Energy Ltd et ses
filiales, décline(nt) toute responsabilité au titre de ce message, dans l'hypothèse où ce dernier aurait été modifié.

---



**ocean energy ltd**

Trust House 112, Bonadie Street – KINGSTOWN – SAINT-VINCENT

**Standard Terms and Conditions for the Sale of Marine Bunker Fuels, Lubricants and Other Products**

**Effective from 25ᵗʰ November 2014**

**1.00 INTRODUCTION**

**1.01** Except as may otherwise be expressly agreed in writing by the parties hereto, these Terms and Conditions shall apply to all sales and supplies by "Ocean Energy LTD" (also referred to as "Ocean Energy" or "OE") of Trust House 112, Bonadie Street, Saint Vincent (the "Seller")   to any another party (the "Buyer")  of Marine Bunker Fuels and/or Marine Lubricants and/or other products (the "Product"). These terms and conditions may be referred to as "Ocean Energy LTD's Standard Terms and Conditions."

These terms and conditions shall override any other different terms or conditions stipulated, incorporated or referred to by the Buyer, whether in his purchase order or in any negotiation, unless otherwise agreed to by Ocean Energy in a subsequent writing.

**1.02** The order for Product shall be considered firm and binding upon Buyer's acceptance of price quoted by Ocean Energy LTD and confirmation in writing from the Seller to the Buyer. Confirmation in writing by Buyer may be provided to the Seller, but the absence of such confirmation shall not avoid the agreement of sale.

**1.03** These Terms and Conditions apply to all offers, quotations, orders, agreements, supplies, services and all subsequent contracts of whatever nature, except where otherwise is expressly agreed in writing by Ocean Energy LTD.

In any case, in the event of a conflict between these terms and conditions and the specific terms of Ocean Energy's confirmation, Ocean Energy's confirmation shall prevail except as provided for in Clauses 17.01 and 17.02.

Moreover, whenever Ocean Energy for the purpose of purchasing the Product to be sold to the Buyer enters into a contract with Physical Suppliers of the Product which contains terms and conditions other than the following, the terms and conditions which apply as between Ocean Energy and the Physical Supplier will be available on request and will be deemed incorporated into these terms and conditions for the benefit of Ocean Energy in so far as they further limit the liability of the Physical Supplier / Seller and / or provide more protection and / or grant more security to the Physical Supplier / Seller for the payment of the supply.

**2.00 DEFINITIONS**

In these Standard Terms and Conditions the following terms shall have the following meaning:

**2.01 Agreement**: The agreement between the Seller and the Buyer evidenced by the Confirmation.

**2.02 Basic Price**: The basic price is defined as the unit price of the Product multiplied by the number of units of the Product delivered to the Vessel.

**2.03 Seller**: The Seller is defined as Ocean Energy LTD of Trust House 112, Bonadie Street, Kingstown, Saint Vincent, acting through any of its servants, agents, assigns, subcontractors and any and all other persons acting under the Seller's written instructions in fulfilment, compliance or observance of the Agreement unless the context otherwise requires or permits.

**2.04 Confirmation**: A confirmation in writing from the Seller to the Buyer setting forth the particular terms of each sale of Product.

**2.05 Buyer**: Buyer means jointly and severally:

a)      The person, party or entity so identified in the Confirmation as the Buyer and the party with whom the Seller contracts to sell the Product  and any agent, principal, associate, manager, partner, servant, parent, subsidiary, owner, or shareholder thereof,



b)      the Vessel (as defined in clause 2.15) and her Master, Registered Owners, Beneficial Owners, Disponent owners, Managers / Operators, Charterers, Sub-charterers, Time Charterers, Bareboat Charterers, and any party benefitting from consuming the Product delivered,

c)      any party requesting offers and quotations for ordering the Product, even if only as agent or manager, and any party on whose behalf the said offers, quotations, orders and subsequent agreements or contracts have been made, being in any case understood that the party identified in the Confirmation as the Buyer and the party with whom the Seller contracts to sell the Product are also jointly responsible for any act / or omissions of the receiving vessel, her Master, Registered Owners, Beneficial Owners, Managers / Operators, Disponent Owners, Time Charters, Bareboat Charters, vessel's crew and vessel's officers.

**2.06 Delivery**: as defined in Clause 8.00.

**2.07 Due date**: The date specified in the Confirmation for payment of the Price and any and all other fees, Further Costs, charges and like items.

**2.08 Gender, Singular and Plural**: Unless the context otherwise requires, all references in the Agreement to one gender shall be deemed to include all others and references to the singular shall be deemed to include the plural and vice versa.

**2.09 Physical or Local Supplier**: The party and/or person who has been instructed by the Seller to physically supply / deliver the Product to the Vessel together with that party's or person's servants, agents, successors, subcontractors and assigns. The Physical Supplier may be the Seller or any other party and/or person.

**2.10 Place of Supply**: The port or other readily identifiable geographical location specified in the Confirmation wherein or adjacent to which is the Point of Delivery.

**2.11 Point of Delivery**: The precise place at which Delivery is to be effected as provided in the Confirmation or as thereafter confirmed, advised or revised by the Seller or the Physical Supplier being a berth, mooring, anchorage or other point within, adjacent to or associated with the Place of Supply.

**2.12 Price**: The Price shall be the aggregate of the basic price and further cost as defined in Clause 11.00.

**2.13 Product**: The marine fuels, oils, lubricants, goods, items, equipment and materials of whatever type and description as specified in the Confirmation, being the subject of the Agreement.

**2.14 Unit Price**: The rate of price in United States Dollars (or such other currency specified in the Confirmation) per metric tonne (or such other unit of measurement specified in the Confirmation) of Product as specified in the Confirmation.

**2.15 Vessel**: The Vessel, ship, barge, yacht, craft, tank, container, facility or any other unit nominated to receive Product as specified in the Confirmation.

**2.16 Written, in Writing and Notice**: Any requirement for written communication, including the giving of any notice, may be fulfilled by the use of electronic mail, letter post, courier, telex, facsimile transmission or any other medium that produces a tangible result for the intended recipient. The communication shall be deemed to have been given and received upon completion of transmission for any electrical or electronic or facsimile medium, within three working days of dispatch for inland letter post and on the expiry of the declared or guaranteed time of delivery of any courier or monitored service.

**2.17 Further Costs**: As defined in Clause 11.02

**2.18 Notice of Claim**: Written notice of any claim or potential claim by the Buyer.

**3.00 HEADINGS**

The use of headings and explanatory notes is for convenience and elucidation only. They are not part of the Agreement.

**4.00 ENTIRETY AND VALIDITY**

These Terms and Conditions together with the Confirmation constitute the entire Agreement.

These Terms and Conditions have been published on the Seller's website and are considered well known to Buyers. They shall apply to any and all sales of the Product even if not referred to in the Confirmations.

No derogation, addition or amendment to the Agreement shall be of any force or effect unless and until expressly confirmed in writing by the Seller. If any provision of the Agreement shall to any extent be invalid or unenforceable, the remainder of the Agreement shall not be affected thereby.

## 5.00 FORCE MAJEURE

**5.01** Neither the Seller nor the Physical Supplier shall be liable for any loss, claim, damage, demurrage, costs or expenses of whatever nature arising from breaches of their obligations / from  the failure to fulfil or comply with any term or condition of the Agreement due to *cas fortuit* or force majeure,  meaning such expressions any circumstances whatsoever which are not within the immediate and reasonable control of the Seller and / or the Physical Supplier, including, but without limiting the generality of the foregoing, any act of God, fires, floods, perils or sea, earthquake, storm, swell, ice, exceptional weather conditions,  any act of war (declared or undeclared), civil commotions, military operations, hostilities, embargoes, Sanctions accidents, governmental intervention, order, request or restriction, any act of third party, congestion, changed market conditions,  unavailability of barges, closing or limitations of functioning of power plants and / or reception facilities, failure of equipment, fault or failure of Vessel, master or crew, act or omission of Buyer, strike, lockout or labour dispute or reasonable apprehension thereof, any government order, request or restriction, or acts in compliance with requests of persons purporting to act on behalf of a government authority, or any other similar causes, any shortage or limitation restriction or interruption to existing or contemplated sources of supply of Product or the means of supply thereof and/or the means of delivery. Neither the Seller nor the Physical Supplier shall be required to make any deliveries which fail in whole or in part as a result of the causes set out in this Article at any later time.

**5.02** Being in any case understood that these provisions do not excuse the Buyer from its obligation to make payment for all amount due to the Seller, if the Buyer exercises reasonable diligence, the Buyer shall not be liable for failure to receive any particular delivery if prevented therefrom by force majeure. The Buyer shall indemnify the Seller or the Seller's Physical Supplier for any damage caused by the Buyer, the Buyer's agent or employees in connection with deliveries hereunder.

**5.03** Declaration of Force Majeure shall be given without undue delay once such event has come to the knowledge of the respective party declaring same.

## 6.00 AGENTS

Being in any case understood Buyer's responsibility under these general terms and conditions, if the agreement is entered into by an agent or broker of Buyer, whether such agency or brokerage is disclosed or undisclosed, then also such agent or broker shall be liable not only as agent or broker but also as Buyer under the Agreement.

Should delivery be made not directly by Seller, but by a third party acting as an agent for Seller, it  is understood that these provisions shall apply under the Agreement at all effects.

## 7.00 ASSIGNMENT

The Buyer shall not assign its interest in the Agreement without the prior written approval of the Seller. The Seller may assign alternatively, novate the agreement and shall thereafter give notice thereof to the Buyer.

## 8.00 DELIVERY

**8.01 Allocation.** If the Seller or Physical Supplier at any time and for any reason believes that there may be a shortage of Product at the Place of Supply, it may allocate its available and anticipated supply of Product among its Buyers in such a manner as it may, in its absolute discretion, determine.

**8.02 Restrictions.** The Seller or Physical Supplier shall not be required to deliver Product into any of the Vessel's tanks or other places that are not regularly used for storage of bunkers or lubricants or other products as the case may be and shall not be required to deliver any Product for the export or delivery of which a Government or any other type of permit is required and has not been obtained.

**8.03 Means and Point of Delivery.** Delivery shall be effected in one or more consignments at the Point of Delivery by such means as the Seller or Physical Supplier shall deem appropriate in the circumstances. Seller does not warrant  nor shall be deemed to warrant the safety of the Point of Delivery or of the facility (ies) where the Vessel load and assumes no liability in respect thereof, except for loss or damage directly caused by his failure to exercise reasonable care-

**8.04 Barging.** In the event of delivery by barge, the Buyer shall at its own expense provide a clear and safe berth for the barge alongside the Vessel's receiving lines and shall provide all necessary facilities and assistance required to effect delivery on 24 hours per day basis.

Seller shall not be obliged to make delivery when in the opinion of the Seller and / or the Physical Supplier a clear and safe berth is not made available.

The Buyer agrees to pay and indemnify the Seller against all claims, costs, losses and expenses in respect to any loss, damage or delay caused by the Vessel and/or Vessel's personnel to any barges and/or its equipment and injury and/or death caused by the Vessel and/or the Vessel's personnel to any of the personnel effecting delivery in the course of or in connection with delivery of Product. Where lighterage is employed, lighterage charges shall be for the account of Buyer. Lighterage will be charged on the quantity delivered to the Buyer's Vessel in accordance with the rates and charges of the barge contractor. Deliveries of Products on two or more barges will be subject to separate charges.

All costs due to berth congestion shall be for Buyer's account.

**8.05 Connection.** The Buyer shall be responsible for making all connections and disconnections between the pipelines or delivery hoses and the Vessel's intake line and shall render all other necessary assistance and provide sufficient tankage and equipment to receive promptly each and every consignment of the Delivery. The Buyer is responsible for ensuring that Product is delivered at a safe rate and pressure and that all equipment utilised therefore is in a safe and satisfactory condition. In any event the Buyer shall be responsible to ensure that the connection of the delivery hose to the Vessel has been properly and safely made.

**8.06 Completion of delivery.** Delivery shall be deemed completed when the Product has passed the flange connecting the Physical Supplier's delivery facilities with the receiving facilities provided by the Buyer, and/or, where appropriate, has passed the Vessel's rail and/or Point of Delivery whether product is delivered ex-wharf or by barge. At either location, pumping shall be performed under the direction and responsibility of Buyer or Buyer's Vessel personnel.

**8.07 Title.** Title in and to the Product delivered and/or property rights in and to such Product shall remain vested in the Seller, and shall pass to the Buyer only after the Price has been received by the Seller as provided in Clause 12. Until such time as the Price is received by the Seller the person or entity in possession of the Product delivered shall hold the Product as a mere bailee and shall hold the Product on behalf of the Seller and to the Seller's order. For the avoidance of doubt, where a mortgagee bank enforces any rights against the Vessel and becomes a mortgagee in possession of the Product then as bailee the mortgagee bank is liable to the Seller for fulfilment of the Agreement.

**8.08 Risk.** The Seller's responsibility for Product shall cease, and the Buyer shall assume all the risks and liabilities relating thereto, including loss, damage, deterioration, depreciation, contamination, evaporation or shrinkage of Product and responsibility for loss, damage and harm caused by pollution or in any other manner to third parties at the time Product leaves the Physical Supplier's fixed depot or wharf facilities. The Buyer agrees to indemnify without limit the Seller in respect of any liability, claim or demand for which the Buyer is liable.

**8.09 Measurement.** The quantity of Product delivered hereunder shall be determined at the Physical Supplier's option by one of such generally recognized methods of measurement as is appropriate in the circumstances.

**8.10 Specification.** The Product to be delivered shall be as specified in the Confirmation and, other than as more precisely specified therein, shall be one of the Seller or Physical Supplier's commercial grades of Product as currently offered generally to its Buyers at the time and Point of Delivery for marine Products. No other warranties, express or implied as to quality or fitness for any purpose, are given or form part of the Agreement. Buyer shall also assume sole responsibility for the selection and fitness of its choice of Product for any particular use or purpose, and the Seller shall assume no responsibility whatsoever for the compliance or fitness of the Product for a specific type of engine or equipment which the Buyer may or may not have agreed upon in any term or otherwise. This includes but is not limited to the quality, sulphur content and any other specific characteristics of the Products whatsoever. Any and all warranties regarding the satisfactory quality, merchantability, fitness for purpose, description or otherwise, are hereby excluded and disclaimed. Where specifications designate a maximum value, no minimum value is guaranteed unless expressly stated in the Confirmation, and conversely where minimum values are provided in a specification, no maximum values are guaranteed unless expressly stated in the Confirmation.

**8.11 Compatibility and Segregation.** Responsibility for establishing compatibility of Product delivered with any other product or products and for segregating or co-mingling the same rests solely with the Buyer. In any case, Seller shall not be liable or anyhow responsible for any problems due to the incompatibility between products. Moreover it shall be Buyer's responsibility ascertaining and making sure that Vessel's tanks are clean and cargoworthy under all respects.

**8.12 Substitution.** The Seller may discharge its obligation to deliver Product as specified in the Confirmation by supplying in substitution thereof product of a different grade and/or brand name provided always that such substitute product is of an equivalent or superior specification to that specified in the Confirmation.

**8.13 Availability.** Subject to the availability of Product, the availability of facilities at the Place of Supply and Point of Delivery, and the customary priority and to the Buyer giving notice in accordance with Clause 8.16, the Seller or Physical Supplier will use its best endeavours to ensure that Product is delivered promptly upon the Vessel's arrival but the Seller or Physical Supplier shall not be responsible for any demurrage, detention, loss, expense, damage or increased costs incurred in consequence of the Vessel not being supplied promptly or otherwise being delayed or restrained for any reason whatsoever.

**8.14 Time.** The Buyer is responsible for ensuring that the Vessel is ready to receive Product at the Point of Delivery on the expiry of the notice given in accordance with Clause 8.16.

**8.15 Delay.** In the event that the Vessel's arrival at the Point of Delivery is delayed or likely to be delayed, the Buyer shall give immediate written notice to the Seller. The Buyer should also ensure that the Vessel's agent at the Place of Supply is similarly informed and that the agent advises the Physical Supplier accordingly. At the Buyer's request the Seller or Physical Supplier will use its best endeavours to supply a delayed Vessel on the terms originally agreed but reserves the right to pass on to the Buyer all damages and all additional expenses and costs, including increased Basic Price arising from the Vessel's delayed arrival.

In any case, should the Vessel for any reason arrive later than 3 days after the ETA notified to Seller, the latter shall have the option to cancel the supply.

**8.16 Notice and Other Delivery Requirements**. The Buyer must give not less than 72 hours' notice (excluding holidays and other non-working days at the Place of Supply) of the Vessel's readiness to receive Product to the Seller and to the Physical Supplier. Notice must be given during the Seller's normal business hours (Monday to Friday inclusive, 09:00-18:00 Monaco, Athens, Miami or Singapore time as the case may be). Notice given outside these hours will be deemed to have been given at 09:00 on the first business day thereafter. If Buyer fails in giving such notice, the Seller shall have the option to cancel the supply. The Buyer shall be responsible in any event for any costs and or expenses incurred and damages suffered by the Seller.

Furthermore, it is in all circumstances and on all occasions the responsibility and duty of the Buyer to ascertain and, where appropriate, to comply with:

      a. The precise requirements of the Physical Supplier and any other person, body or authority in respect of the giving of notice of the Vessel's time of arrival at the Point of Delivery.

      b. The exact location of the Point of Delivery.

      c. Any particular requirements to enable Delivery to be effected as efficaciously as possible.

The Buyer is advised to instruct its agent at the Place of Supply to liaise with the Physical Supplier so as to ensure compliance with these provisions.

**8.17 Information**. In response to a specific request for information from the Buyer in respect of the Point of Delivery, the Seller will use its best endeavours to obtain or provide the information requested. While every care will be taken to ensure that such information is accurate and up-to-date, it is furnished on the strict understanding that it is not a contractual representation and that no responsibility whatsoever will attach to the Seller for its accuracy and veracity.

**8.18 Environmental Protection**. Without prejudice to Clauses 8.08 and 15.03 the Seller or Physical Supplier may at any time and without notice take any steps which it considers necessary to protect the environment from damage arising from spillage or transport of Product. Any action so taken shall be on behalf of and at the expense of the Buyer.

**8.19 Cancellation by Buyer Prior to Delivery**. On Buyer's cancellation of a delivery or portion thereof, within 48 hours prior to the scheduled delivery time and date, the Seller shall be entitled to a fee of USD 5.00 per metric ton by way of liquidated damages and as compensation for Seller's relinquishing its rights under the Agreement. The Parties agree that determining the amount of damages to Seller arising from cancellation would be impracticable and extremely difficult and for that reason the above rate of compensation is considered fair and equitable.

**8.20 Miscellaneous**.

**8.20.a)** It is expressly agreed that all deliveries are in any case subject to weather and sea permitting, over vessels' priority, if any, and working hours. If Vessel arrives out of working hours, all extra costs are for Buyer's account. The delivery shall be made during normal working hours and days (as indicated in the port regulations and, in the lack of such regulations, from 8.00 am to 5.00 pm from Monday to Friday) unless required and available at other times (holidays, Saturdays, and Sundays) and permitted by Port regulations. Any additional expenses / overtime / extra time / local charges are on Buyer's account.

**8.20.b)** Seller shall not be in any event liable for any damage or loss or delay or demurrage or detention due to lack of notice, bad weather, barge or port or terminal congestion, expected or unexpected, or to lack of availability of barges / trucks for the Product to be delivered or due to any other reasons beyond the reasonable control of the Seller or avoidable by reasonable care on the part of the Buyer or the vessel.

**8.20.c)** The Buyer shall take prompt delivery of the Product and withdraw the vessel from the terminal. The Buyer shall ensure that the Vessel renders all customary assistance and provides sufficient tank space and equipment to receive prompt delivery. Buyer shall indemnify the Seller of costs and expenses of barge demurrage or truck overtime due to its delay in taking delivery or in vacating berth. Moreover, without prejudice to the previous covenants, in any case if Buyer, its agents, servants, Vessel's officers or Vessel's crew cause a delay to Seller's (or Physical Supplier's) facilities in effectuating delivery of Products, Buyer shall pay demurrage to Seller at Seller's established rates and reimburse Seller for any and all other expenses and costs and damages in connection therewith.

**8.20.d)** On completion of delivery, the Buyer or its representative shall give the Seller or the Physical Supplier a signed receipt therefrom in the form presented for signature by the Seller or Physical Supplier.


**9.00 CANCELLATION AND BREACH**

Without prejudice to clause 8.19, in the event of the Buyer, at any time, failing to take delivery of part or the entire requested Product, the Seller shall have the right to pursue a claim against both the Buyer and the Vessel for all loss and damage thereby suffered, including loss of profit. The Seller may treat any other breach by the Buyer of any express term of the Agreement as a breach of a condition and it

may, at its discretion, treat the Agreement as repudiated or terminated and seek such remedies, as it considers appropriate. Nevertheless, the provisions of Clauses 15.01, 17.01, 17.02, and 18.00 shall survive the termination of the Agreement in any event.

## 10.00 LIENS

**10.01** Where Product is supplied to a Vessel, in addition to any other security, the Agreement is entered into and Product is supplied upon the faith and credit of the Vessel. It is agreed and acknowledged that a maritime lien against the Vessel is thereby created for the Price of Product supplied and that the Seller in agreeing to deliver Product to the Vessel does so relying upon the faith and credit of the Vessel, and that such maritime lien may be enforced in any court of competent jurisdiction. The Buyer represents that it is the Vessel's Owner, or Charterer, or a person authorized by the Vessel's Owner or Charterer to order the Products. The Buyer, if not the owner of the Vessel, hereby expressly warrants that Buyer has the authority of the owner to pledge the Vessel's credit as aforesaid and that he has given notice of the Provisions of this Clause to the owner. The Seller shall not be bound by any attempt by any person to restrict, limit or prohibit its lien or liens attaching to a Vessel unless notice in writing of the same is given to the Seller before it sends its Confirmation to the Buyer.

**10.02** Any notice by Buyer that a maritime lien on the Vessel may not be created because of the existence in Buyer's charter of a Prohibition of Lien Clause, or for any other reason, must be given to Seller in the initial order for Product, in which case no credit can be granted to Buyer and the Product shall be paid prior to delivery. Any notice of such restriction given by Buyer, its agents, ship's personnel or other person later than in the initial order shall not effect a modification of the terms and conditions of sale except that any granting of credit by Seller is rescinded on receipt of the notice, with full payment then due.

## 11.00 THE PRICE

**11.01 Unit Price.** Wherein the Confirmation of the Unit Price is stated to be not subject to variation, the Unit Price will, subject to Clause 8.15, not be varied up to the expected date of the delivery mentioned in the Confirmation. After that date, Seller reserves the right to change it.

**11.02 Further Cost.** In addition to the Basic Price of the Product, the Buyer agrees to pay for

a) any charges for current barge and/or lighterage and/or current truck and/or wagon, and / or clean-up costs including overtime or other like payments,

b) any costs due to terminal or berth,

c) any mooring and unmooring charges, wharfage, booms, charges, insurance pilotage,  agency fees or port dues which Seller may incur in connection with any vessel the Product is delivered to,

d) fire – fighting, anti-pollution, any authorisation and any Customs charges,

e) any duties and/or taxes incurred by Seller or for which Seller is accountable in respect of deliveries or sale of the products,

f) any additional cost incurred by Seller in respect of payments for overtime, and

g) all other similar costs and expenses incurred by or charged to the Seller.

Such charges, costs and expenses will be passed on to the Buyer as and when they are advised to the Seller and together with the Basic Price shall for all purposes constitute the Price due from the Buyer to the Seller for the Product supplied.

**11.03 Notice of the Price.** The Seller will give notice of the Price to the Buyer as soon as reasonably practicable after Delivery. In certain circumstances the Seller will give notice of the Price in instalments. Where notification of the Price is given in instalments, each element of the Price so notified shall, when due, constitute an enforceable debt due from the Buyer to the Seller. Notice of the Price may, at the Seller's option, be provided by invoice and sent by post or telex or facsimile or via internet or as otherwise provided herein or as agreed.

**11.04 Proof of Delivery.** The Buyer or his representative should attend Delivery and obtain at that time all outstanding information relating to Delivery, including the exact quantities and precise specification of Product delivered. Unless otherwise requested by the Buyer prior to dispatch by the Seller of the Confirmation, the Seller shall be under no obligation at any time to produce to the Buyer any evidence of Delivery to the Vessel. It is expressly agreed that the furnishing by the Seller of proof of Delivery is not a prerequisite to payment of the Price.

## 12.00 PAYMENT

Each of the following terms apply unless the Confirmation otherwise provides:

**12.01** Payment of the Price will be made in United States dollars, or any other currency as agreed in the Confirmation, to the bank and account specified by the Seller so as to ensure that the Seller receives value for the payment in cleared funds on or before the Due Date.

Payment shall be deemed to have been effected on the date when full amount due to the Seller is credited to Seller's account. Payment shall be made in full, without any set-off, counterclaim deduction and / or discount, free of bank charges.

**12.02** Due date is as provided in the Confirmation or, in default, the date of Delivery. Any credit term granted in the Confirmation is conditioned upon Buyer's compliance with all the due dates for payment for early supplies, failing which all Prices will be considered immediately due.

At the sole discretion of the Seller, invoices may be submitted to the Buyer by any form of telegraphic communication, including, but not limited to, e-mail or facsimile. Lack of receipt of the invoice does not relieve the Buyer from its obligation to make full payment of the amount due.

**12.03** Timely payment is of the essence of the Agreement.

**12.04** If the Product is supplied on a credit basis and full payment is not received by on the due date, the Buyer shall immediately be in default. Late payment will incur a financial charge to Buyer of 2% per calendar month on the outstanding sum calculated on a daily basis from Due Date until the payment is received by the Seller. This shall be in addition to any other remedies which Seller may be entitled to. Accrued financial charges will be added to and become part of the outstanding sum at monthly intervals.

**12.05** Payment will be made by way of telegraphic, telex, swift or rapid electronic transfer to the bank and account specified by the Seller. All bank and other charges, if any, incurred in effecting remittance will be for the account of the Buyer. Advice of remittance, including identifying references, should always be given to the Seller.

**12.06** Payments received by the Seller from or on behalf of the Buyer, notwithstanding any specific request to the contrary, will be applied in the following order in diminution or extinction of:

　　　a. Accrued financial and other charges in respect of transactions for which the principal sum has been previously paid.

　　　b. Accrued financial and other charges arising from all other transactions.

　　　c. Any principal sum or sums due and outstanding commencing with the oldest and proceeding chronologically thereafter to the most recent.

　　　d. Any principal sum which the Seller knows or reasonably expects will fall due at a future date.

**12.07** The Seller may in good faith vary, amend, withdraw, substitute or add to the terms relating to payment at any time in the course of a transaction in such a manner as it shall in its absolute discretion consider necessary to protect its interests.

**12.08** If at any time the reputation, standing, creditworthiness, liquidity or solvency of the Buyer or any subsidiary, parent, associate or affiliate thereof should give the Seller reasonable cause for concern, the Seller may, without prejudice to all other rights and remedies which it may have, give notice to the Buyer that credit facilities from the Seller to the Buyer are withdrawn or suspended as the case may be and all sums outstanding shall thereupon fall due for immediate payment. In any case, if at any time prior to delivery of the Product under this Agreement to the Vessel, the Buyer is in default of any of its obligations under this or any other agreement between the Seller and the Buyer, the Seller shall be entitled to cancel this Agreement and / or to refuse delivery under this Agreement, and shall be under no liability for damages or otherwise to the Buyer under this Agreement.

**12.09** In the event that the Buyer or any subsidiary or parent thereof shall commit an act of bankruptcy or shall be the subject of proceedings, judicial or otherwise commenced for debt, bankruptcy, insolvency, liquidation or winding up, the Seller may forthwith terminate the Agreement and shall be under no liability for damages or otherwise to the Buyer. In case of bankruptcy, and to the extent permitted by law, Buyer agrees that Seller possesses priority over all other contract claims against Buyer.

**12.10** The full legal and other costs and expenses incurred by the Seller including those of the Seller own legal department and of other lawyers in connection with any breach by the Buyer of any term of the Agreement including but not limited to actions for debt shall be for the Buyer's account and shall for all purpose form part of the Price due from the Buyer to the Seller for Product supplied.

## 13.00 CLAIMS, DISPUTES AND PRECAUTIONS

**13.01 Notification.** Written notice of any claim or potential claim must be given to the Seller within the time limit specified. It is the Buyer's responsibility to ensure that notice is received by the Seller, whose confirmation of receipt should always be sought. Regardless of whether a claim or dispute has arisen or is anticipated, the Buyer must always give prompt notice to the Seller of any alleged discrepancy, error or omission present in any form or document tendered, submitted or produced by the Physical Supplier and of any unusual occurrence relating to the Delivery.

**13.02 Sufficiency of Information.** To enable the Seller to investigate and pursue a claim the notice must give sufficient information for the Seller to be able to identify the relevant transactions, the nature of the complaint and the loss or damage alleged. Any notice which

does not give such sufficient information will not be valid. For the same reasons, the Buyer must provide a full and complete response to any and all questions, enquiries and requests made of it by the Seller concerning the claim and matters relating thereto.

**13.03 Quantity claims and disputes.** The quantity to be delivered is that indicated in the confirmation. Should the Buyer require more quantity to be delivered after confirmation has been sent, Seller shall make reasonable efforts to satisfy Buyer's request but with no obligation whatsoever to deliver the quantity exceeding that indicated in the Confirmation.

**13.03.1** The Buyer's representative shall, together with Seller's or Physical Supplier's representative measure and verify the quantities of Product delivered from the tank from which delivery is made. For bulk deliveries, delivery barges, wagons and vehicles must be checked by tank dipping to measure the contents and ensure full turnout. Flow meters must be checked for seals, correct settings and calibration, and general condition. All of these checks must be carried out before and after delivery of each consignment and each barge, wagon or vehicle tank load. The Delivery must be supervised at all times and care must be taken in ensuring that all documentation is complete and accurate before signing and stamping. Any discrepancies must be recorded on the Seller / Physical Supplier's delivery receipt. The Seller shall reject claims for short delivery where these receiving procedures are not followed.

In any case, should bunker quantity be subject to determination by local custom authorities, it is understood that the quantity binding upon the parties shall be exclusively the one resulting from such determination, and afterwards indicated in the pertinent document delivered by the authority mentioned above.

**13.03.2** The Seller will not accept a claim for short delivery based upon figures obtained by measuring Product in the Vessel's tanks as well as findings of any surveyor appointed unilaterally by buyer. When Product is supplied by barge, the particular barge will present its tank calibration and ullage sounding records, which are considered to be the sole valid and binding documents to determine the quantity supplied. Quantities calculated from the receiving Vessel's sounding shall not be considered.

**13.03.3** Should the Buyer's representative fail or decline to verify the quantities, the measurements of quantities made by the Seller or Physical supplier shall be final, conclusive and binding and the Buyer shall be deemed to have waived any and all claims in regard to any variance.

**13.03.4** Buyer expressly undertakes not to make any endorsement, complaint/comment on the Product Delivery Receipt when presented for signature.

In the event of complaint/comment on the quantity of Product delivered, the Buyer or the Master of the Vessel shall give to the Seller or Physical Supplier at the time of loading a letter of protest separately, followed by a formal written Buyer's complaint in detail to the Seller, with full supporting vouchers, in writing within 7 (seven) days from the date of the delivery.

If Buyer fails to give such letter of protest or such written detailed formal complaint within the mentioned time limits, any Buyer's claim shall be conclusively deemed waived It is Buyer's responsibility to ensure the notice is timely received by Seller whose confirmation of receipt should always be sought.

**13.03.5** The quantity agreed upon, the Seller or Physical Supplier shall be at liberty to provide, and the Buyer shall accept a variation of 5% from the agreed quantity, with no other consequence than a similar variation to the corresponding invoice from the Seller.

**13.03.6** The time limit for receipt by the Seller of notice of a quantity dispute is 7 (seven) days from the date of Delivery or such shorter period as specified in the Confirmation.

**13.3.7** Should a dispute arise on the quantity delivered, the parties shall immediately appoint, together with the Physical Supplier, an Independent Surveyor who shall ascertain the quantity actually delivered and whose determination shall be final and binding upon the parties, unless Independent Surveyor's wilful misconduct is proved. Costs for the survey shall be paid by the defaulting party.

**13.3.8** Claims, if any, are to be settled separately from payment of the Price, which, in all cases, has to be honoured in full without delay.

**13.04 Quality Claims and Disputes.** The quality shall be the one specified in the Confirmation and, other than as more precisely specified therein, shall be one of the Seller or Physical Supplier commercial grades of Products as currently offered to its Buyers at the time and Point of Delivery for marine products.

Should the quality above not be available, Seller shall advise the Buyer and offer the grades and quantities available at that time without any liability whatsoever to Seller.

Buyer shall have the responsibility for the selection and acceptance of the Product. In particular, it is Buyer's responsibility to ensure that the products tendered for Delivery are those which are required by the Vessel and are delivered into the correct tanks. The Vessel shall provide and have appropriate and segregated tanks to receive the contracted quantity of Product; and the Vessel shall always be able to perform its own blending on board if any blending is deemed to be required by Buyer. The Vessel shall upon delivery test the Products supplied by running her engines or auxiliaries or equipment, for which the Products are supplied, for a minimum of 1 (one) hour to

determine that the Products are satisfactory. In the event the Products are not considered satisfactory, the Seller and Physical Supplier are to be notified immediately after such test period has expired.

**13.04.1** It is the duty of the Buyer to instruct Physical Supplier and Vessel's officers and crew to take four (4) representative samples of every consignment and load of the Product on commencement of delivery in accordance with the custom at Point of Delivery. The four representative samples must be signed, labelled and sealed by a representative of the Physical Supplier and by an officer of the Vessel or other senior representative of the Buyer. Samples have to be provided with labels showing the Vessel's name, Place of Supply, Point of Delivery, Product name, Delivery Date and seal number. The seal numbers shall be inserted into the Physical Supplier's delivery receipt. By signing and stamping the Physical Supplier's delivery receipt, both parties agree to the fact that the samples referred to therein are deemed valid and taken in accordance with the requirements as specified in this clause.

No other samples shall be representative for Seller.

If Buyer / Vessel's crew / Vessel's officer fails to attend the sample taking, the samples will be sealed and signed by Physical Supplier only.

**13.04.2** In case that drip sampling is not available on board barge, truck or shore tank, samples shall be taken as a composite of each tank from which supplies are made, divided with 1/4 from each the top, mid and bottom of the tanks.

**13.04.3** Two (2) sets of samples taken shall be retained by the Seller / Physical Supplier for sixty (60) days after delivery of the Product or, if requested by the Buyer in writing and agreed by the Seller, for as long as the Buyer reasonably required. The other two (2) sets of samples must be retained by the Vessel, one of which may also be used for the purposes of confirming the sulphur contact of the marine fuel and such other matters as are specifically set out in Marpol Annex VI, Regulation 18.

**13.04.4** In the event of the Buyer having grounds to believe that Product supplied does not accord with the relevant description in the Confirmation or is defective, the Buyer shall immediately:

 a. Take all reasonable steps to mitigate the consequences of having been supplied with possibly defective or incorrect Product.

 b. Give immediate written notice with full details of the possibly defective or incorrect Product to the Seller together with the Vessel's position, destination and ETA; the quantities and locations of all Products on board the Vessel/stored in the Vessel, the rate and quantity of consumption since delivery and the location immediately prior to consumption of Products consumed; for each of the three preceding deliveries to the Vessel, the quantity, quality and specification of Product supplied, the place and date of supply, and the name of the Physical Supplier.

 c. Inform the Seller of the whereabouts of the Buyer's Set of Samples.

**13.04.5** In the event of a dispute in regard to the quality of the Product delivered, the samples drawn pursuant to clauses related hereto above in this Article, shall be deemed to be conclusive and final evidence of the quality of the product delivered. One, and only one, of the samples retained by Physical Supplier  shall be forwarded to an independent laboratory to perform a set of tests, the result of which are to be made available to both parties. Those test results shall be final and binding upon both Buyer and Seller as to the parameters tested. The parties are to use best endeavours to agree the independent laboratory to perform the tests. If, however, no agreement can be reached on the choice of laboratory within three (3) days of the Buyer being advised of the Seller opting to have the sample tested, the Seller is at liberty to send the sample to a reputable and independent laboratory of its choice for the tests to be conducted, and those test result will be final and binding upon Buyer and Seller as set out above.

Analysis costs to be paid by the Buyer if the Product if found in order, or by the Seller if it is found out of the agreed specifications..

**13.04.6** The seal must be breached only in presence of the Seller unless it declares in writing that it will not be present; and parties shall have the right to appoint independent person(s) or institute(s) to witness seal breaking. No samples subsequently taken shall be allowed as (additional) evidence. If any of the seals have been removed or tampered with by an unauthorised person or not in presence of the Seller, such sample(s) shall be deemed to have no value as evidence.

**13.04.7** Any eventual samples drawn by Buyer's personnel either during delivery or at any later date after delivery shall not be valid as indicator of the quality supplied. The fact that such samples may eventually bear the signature of personnel on board the barge or tank truck or other delivery conveyance shall have no legal significance as such local personnel have no authority to bind Seller to different contractual terms. Seller shall have no liability for claims arising in circumstances where Buyer may have commingled the products on board the Vessel with other Products.

**13.04.8** Notwithstanding provisions of close 17, if it is alleged that any equipment or machinery has been damaged by defective Product, full details must be given to the Seller at the earliest opportunity and the item must be preserved and made available for inspection on demand, at any reasonable time or times, to the Seller or its representative.

**13.04.9** The time limit for receipt by the Seller of a Buyer's written notice of a quality claim is 7 (seven) days from the date of Delivery or such shorter period as is specified in the Confirmation.

It is Buyer's responsibility to ensure that the notice is received by the Seller, whose confirmation of receipt should always be sought.

If the Buyer fails to give written notification within the mentioned time limit, any quality claim shall be conclusively deemed to have been waived.

In case of any complaint, Seller may inspect the Vessel, whether at Buyer's request or otherwise. Such inspection or analysis made in connection herewith shall be made entirely without any obligation on Seller's behalf to consider or act upon any claim or complaint by Buyer or otherwise and shall be entirely without prejudice to Seller's position.

**13.05 Other Claims and Disputes.** Notice of all other claims, specifically excluding any and all claims relating to or associated with those relating to matters of quantity or quality which are subject to the time limits set out in sub-clause 13.03.4 and 13.04.9 above, should be given to the Seller as soon as reasonably possible and in any event no later than seven (7) days after delivery. If the Confirmation provides for a shorter period, such shorter period shall apply.

It is Buyer's responsibility to ensure that the notice is received by the Seller whose confirmation of receipt should always be sought.

If the Buyer fails to give written notification within the mentioned time limit, any other claim as above shall be conclusively deemed to have been waived.

**13.06** Summary of Time Limits for Submission of Notice of Claim:

Quantity claims and disputes - Seven (7) days

Quality claims and disputes – Seven (7) days

Other claims and disputes – Seven (7) days

All of the above terms run from the date of the delivery and are subject to the provision of shorter time limits in the Confirmation.

**13.07 Submission of Claim Supporting Documentation and Evidence.** As soon as reasonably possible, after providing notice of a claim relating to quantity or quality issues, Buyer shall furnish to the Seller a sample of the Product delivered to the Buyer's Vessel, and all documentation supporting Buyer's claim, including, but not limited to, all analyses performed on the Product. Buyer shall immediately give Seller all reasonable opportunity to inspect the Vessel, including, without limitation, its engines, fuel tanks, equipment, logs, records and copies of communications, including communications between Vessel and Buyer (and/or between Vessel and owner or operator), as well as communications to and from fuel testing organisations consulted by Buyer or Vessel interests. If Notice of a Claim is not provided within the periods above or the conditions in this sub-paragraph 13.07 are not met within thirty (30) days of the date the Product was delivered to the Vessel, Buyer shall be time-barred from making a claim. The parties also agree that any such claim is time-barred, if litigation is not commenced within one year of the delivery date.

**13.08** A Claim of any nature by Buyer does not relieve Buyer of the responsibility and obligation to make full and timely payment of all amounts billed by Seller. Claims, if any, are to be settled separately from payment of the Price which, in all cases, has to be honoured in full without delay.

## 14.00 WAIVER

The failure by any party to the Agreement to enforce any right against any other party shall not be construed as a waiver of that right or in any way affect the validity of the Agreement. In particular, the granting by the Seller of any additional time to make payment or the waiving or reducing of any financial or other charge shall not prevent the Seller at any time thereafter from relying upon its strict contractual rights.

## 15.00 INDEMNITY

**15.01** The Buyer shall hold Seller harmless from any and all consequences and / or responsibility arising out of any and all uses of the Product after the Product itself has been delivered.

The Buyer shall also indemnify the Seller in respect of all damage or injury occurring to any person or to any property and against all actions, suits, claims, demands, costs, charges, or expenses arising in connection therewith unless the Buyer proves that they have been caused by the negligence or default of the Seller.

Indemnification shall also include all costs, reasonable attorney's fees, and other damages, including, but not limited to, the costs of compelling Buyer to comply with these terms and conditions.

**15.02** Buyer shall also indemnify and hold harmless Seller, the Physical Supplier, the fuel barge contractor and their agents and employees from and against all claims, damages, losses and expenses, including attorney's fees, arising out of or resulting from the performance of services or the providing of Products under this contract, including claims, damages, losses, penalties or expenses arising under any air, water quality or hazardous waste statute, regulation or ordinance, hereinafter referred to as "pollution claims", providing that any such claim, damage, loss or expense (a) is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of

tangible property (other than Buyer's Vessel and its appurtenances) including the loss of use resulting therefrom, or to pollution claims, and (b) is not wholly caused by the Seller, the Physical Supplier, the fuel barge contractor, their agents or employees.

**15.03** Without any prejudice to the above provisions, if a spill occurs while the Product is being delivered, the Buyer shall promptly take such actions as they are reasonably necessary to remove the spilled product and to mitigate the effect of such spill. Buyer shall cooperate and render such assistance as required by Seller in the course of such action. The burden of proof to show Seller's negligence shall be on the Buyer. Buyer shall give Seller all documents and other information concerning any spill, or any program for the prevention thereof that are required by Seller or required by law or regulation applicable at the time and place of delivery.

## 16.00 BUNKER USAGE

Being in any case understood Seller's indemnity as referred to in paragraph 15, Buyer guarantees that the Product supplied by Seller to Buyer shall not be used in any way other than for the bunkering requirements of Buyer's vessel.

## 17.00 LIABILITY

**17.01 Liability.** To the extent permitted by Law, the Seller shall not be liable to the Buyer for any loss or damage of whatsoever nature including physical injury, loss of hire, loss of profit or any other consequential damages or loss whatsoever arising from any cause whatsoever whether in contract, tort or otherwise including the negligence of the Seller, its servants, agents or sub-contractors. Consequential damages or losses include any and all damage claims involving supply chain interruptions, and contracts and/or prospective contracts about which Seller has received no written information at the inception of the Agreement, detention, demurrage, charter hire, crew wages, towage, pilotage, lost profits, barge delivery charges and increased costs or expenses in obtaining replacement Product.

## 17.02 Limitation of Liability

**17.02.1** Notwithstanding any provisions in this Agreement or any confirmation to the contrary, Seller's liability for any breach of contract or warranty, or commission of any tort is limited to the Price, or USD 50,000, whichever is less. Under no circumstances shall Seller be liable should Buyer suffer losses due to any physical damage to property in which Buyer or third parties hold a proprietary interest.

**17.02.2** Seller shall not be liable for demurrage or for loss, damage or expense of any nature whatsoever incurred by Buyer due to any delay in delivery, or failure to make delivery, of Product occasioned by the barge contractor. Seller shall not be liable for such demurrage, loss, damage or expense incurred by Buyer due to delays in furnishing a berth. In any situation not included above, Seller shall not be liable for delay in delivery, or failure to make delivery, of Product unless Buyer proves that the delay or failure was solely caused by gross negligence on the part of the Seller.

**17.02.3** Seller is not liable for supplying defective or improper Product or Product other than as ordered by Buyer, unless the same is directly and solely caused by the negligence of Seller's own employees, which negligence must be affirmatively proved. In such event, Seller's liability, if any, is strictly limited to the cost of replacement of the defective or wrong kind of Product at the date and Place of Supply furnished. Buyer acknowledges and warrants that it is Buyer's responsibility to test the Product provided and to insure that it is proper in all respects prior to the use of such fuel on Buyer's Vessel. Accordingly, Seller shall not be responsible for any damage to Buyer's Vessel, including, without limitation thereto, its machinery or tanks or their contents, caused by use of defective, improper, or the wrong kind of Product.

**17.02.4 DISCLAIMER OF WARRANTIES.** ANY IMPLIED WARANTIES WHATSOEVER, WHETHER STATUTORY OR OTHERWISE, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE OR OF CONDITION, AND ANY ORAL OR IMPLIED AGREEMENTS INCONSISTENT WITH THIS AGREEMENT ARE EXPRESSLY EXCLUDED AND DISCLAIMED.

## 18.00 COMPENSATION

Notwithstanding the foregoing, in the event that the Seller is found to be liable to the Buyer, the total amount payable by way of compensation other than in respect of personal injury or death shall not exceed the price charged to the Buyer for Product supplied under this Agreement. It is a pre-condition to the payment of any compensation by the Seller that all sums standing due to the Seller from the Buyer are first paid and settled.

## 19.00 INSURANCE

The Buyer is responsible for effecting and maintaining in force adequate insurance which will fully protect the Buyer, the Seller and all third parties from all risks, hazards, and perils associated with or arising from the Agreement and Delivery.

## 20.00 LICENCES, PERMITS AND APPROVALS

The Buyer is responsible for obtaining all necessary permits, licenses, and approvals required to enable both parties to execute all of their obligations under the Agreement.

## 21.00 GOOD PRACTICE

The Buyer shall, in addition to observing and complying with the terms of the Agreement, abide by generally accepted good operating practices.

## 22.00 APPLICABLE LAW AND JURISDICTION

These general terms and conditions, the Agreement, its performance and enforcement, except as otherwise expressly agreed in writing, shall be governed by the law of the State of New York (USA).

The Buyer expressly accepts and submits to the non-exclusive jurisdiction of the Court of Genoa (Italy).

Any jurisdiction / arbitration clause applicable in the relationship between the Seller and the Physical Supplier may be enforced by the Seller also in the relationship with the Buyer.

In any event the Seller will remain entitled to institute any action aimed to secure any outstanding claim he may have against the Buyer in front of any Court the Seller may deem fit irrespective of whether or not such Court has jurisdiction on the merits.

## 23.00 SANCTIONS

**23.01** The Buyer represents, warrants and undertakes that:

> **23.01.1** it shall at all times comply with Sanctions applicable to the Seller and/or the Buyer that affect the performance of either party's obligations under this Agreement;
> **23.01.2** it is not, whether directly or indirectly, the subject of any Sanctions and that it will promptly notify the Seller should it become, or have reasonable cause to suspect it will become, subject to Sanctions during the term of this Agreement; and
> **23.01.3** it will not nominate any Vessel to receive Product or perform any of its obligations under this Agreement in violation of any Sanctions or which would put the Seller in breach of any Sanctions.

**23.02** If the Buyer is or becomes subject to Sanctions which affect the ability of either party to perform any obligations under this Agreement or the performance of any aspect of this Agreement becomes prohibited by Sanctions, the Seller may, at its sole discretion, terminate this Agreement by notice to the Buyer.

**23.03** The Seller will have the right to reject any Vessel nomination which violates any Sanctions or puts the Seller in breach of any Sanctions by serving a rejection notice on the Buyer detailing the grounds for the rejection. If the Seller rejects a nomination of a Vessel on these grounds it shall be entitled, at its sole discretion, to (i) require the Buyer to promptly nominate a suitable substitute vessel; or (ii) terminate this Agreement.

**23.04** The service of notice to the Buyer pursuant to Clause 23.02 or 23.03 shall not constitute a breach of this Agreement and the Seller shall not be liable to the Buyer for any losses, claims, costs, expenses, damages or liabilities arising in connection with any such termination or rejection.

**23.05** To the full extent permitted by applicable law, the Buyer shall indemnify the Seller against any and all costs, expenses, losses and liabilities it incurs as a result of the Buyer being in breach of its obligations under this clause 23.



**ocean energy ltd**

TO:   Buyers and/or Master and/or Owners and/or Charterers
      and/or Operators of MV MEGACORE PHILOMENA
AND: OXYGEN MARITIME MANAGEMENT INC

61, VAS. SOFIAS AVENUE

**INVOICE DATE** 04/12/2017

**INVOICE N°**   201711211

11521 Athens - GREECE

Port:   NEW ORLEANS                    REF: MV  MEGACORE PHILOMENA
Delivery Date  14/11/2017              IMO number  9456915

Vessel duly supplied as follows

MTS     150,000 MGO DMA              AT USD   668,00 MTD    =USD   100 200,00
GAL 46993 LUST TAX AT $0,001/GAL                           =USD        46,99

**TOTAL AMOUNT**                                  =USD       100 246,99

**DUE DATE**     13/12/2017                                  S. E. & O

Payment to be effected, free of all charges to us, by telegraphic transfer to:

BANQUE CANTONALE DE GENEVE
QUAI DE L'ILE, 17 - C.P.  2251
CH-1211  GENEVA 2 - SWITZERLAND
SWIFT : BCGECHGG

In favour of:  OCEAN ENERGY LTD, KINGSTOWN - St VINCENT

IBAN Code:  CH97 0078 8000 0504 3248 2

Through:     CITIBANK, NEW-YORK - NY/U.S.A.

             SWIFT : CITI US 33

Remark:     Interests for late payment will be charged at 2 pct pro rata/month

# EXHIBIT C

Trust House 112, Bonadie Street - KINGSTOWN - SAINT VINCENT

# MARINE BUNKER FUEL RECEIPT

*Barge Copy*

**VESSEL DATA**

| NAME OF PORT | BERTH | | VESSEL: |
|---|---|---|---|
| NEW ORLEANS | | | MEGACORE PHILOMENA |

| CUSTOMER NUMBER | CUSTOMER NAME | PLACE | AMA ANCHORAGE | PORT NUMBER |
|---|---|---|---|---|
| | OCEAN ENERGY | USA | DISTRIBUTION ☐ DOMESTIC ☐ FOREIGN | |

GRADES/DELIVERY (ALL VISCOSITY FIGURES STATED BELOW ARE QUOTED IN KINEMATIC CENTISTROKES AT 50° C)

| RECEIPT NUMBER | METHOD OF DELIVERY/CHECK ONE ☐ WHARF ☐ TANK TRUCK/LORRY ☐ LIGHTER | | DELIVERY DATE | DAY 14 | MONTH 11 | YEAR 2017 |

| QUANTITY DELIVERED @15°C (60°F) | NET METRIC TONS | NET U.S. BARRELS | NET U.S. GALLONS | PRODUCT DELIVERED |
|---|---|---|---|---|
| 403606 | | | 1118.88 | Marine Diesel: 15ppm(0.0015%) max sulfur |
| WATER & SOLIDS | | | | 46993  Custom Fuel/CF-4 |

| FLASH POINT | VISCOSITY KINEMATIC CENTISTROKES | | ON-STREAM COMPANY & BARGE NUMBER |
|---|---|---|---|
| 150,000 | 150 | FINISHED | |

| COMPART-MENT NUMBER | SCALE | COMMENCED | GROSS BARRELS/ GALLONS | SCALE | FINISHED | GROSS BARRELS/ GALLONS | NET U.S. GALLONS | GROSS MEASURED BARRELS/GALLONS | TEMP °F | GRAV A.P.I. @ 60°F | DENSITY @ 60°F | BBLS PER METRIC TON | NET VOLUME @ 60°F BARRELS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FEET | IN. | | FEET | IN. | | | | | | | | |
| Hose On: 515 | | | | | | | | | | | | | |
| Hose Off: 725 | | | | | | | | | | | | | |
| | | | | | | | | 60 | 36 | 0.8448 | | | |

| ARRIVED ALONGSIDE | STARTED PUMPING | FINISHED PUMPING | DEPARTURE TIME | DATE |
|---|---|---|---|---|
| 430 ☒ A.M. ☐ P.M. | 525 ☒ A.M. ☐ P.M. | 715 ☒ A.M. ☐ P.M. | 735 ☒ A.M. ☐ P.M. | 11/4/2017 |
| DATE 11/14/2017 | IMO 9456915 | | | |

SIGNATURES/REMARKS - RECEIVED FOR USE AS BUNKERS TOGETHER WITH 4 REPRESENTATIVE SAMPLES TAKEN AT THE SAMPLE POINT SHOWN ABOVE AND REPRESENTATIVE OF THE FUEL SUPPLIED

THE UNDERSIGNED CERTIFIES THAT THIS PROPERTY IS FOR USE SOLELY IN THE OPERATION OF SAID VESSEL AS ENGAGED OR INTERSTATE COASTWISE COMMERCE. IF A FURTHER CERTIFIES THAT SAID VESSEL IS ENGAGED EXCLUSIVELY IN FOREIGN OR INTERSTATE COASTWISE COMMERCE. ANY PURCHASER WHO FRAUDULENTLY USES THIS CERTIFICATE WITHOUT INTENT TO USE THE PROPERTY PURCHASED AS ABOVE STATED SHALL BE SUBJECT TO ALL PENALTIES PROVIDED BY LAW. THE UNDERSIGNED ALSO CERTIFIES THAT THE QUALITY/GRADE RECEIVED IS IN ACCORDANCE WITH THE VESSEL'S REQUIREMENTS. ANY DEVICE FROM THE ABOVE CHARACTERS TO THE CONTRARY NOTWITHSTANDING.

| OWNER'S REPRESENTATIVE | SIGNATURE | PRODUCT DELIVERED | SIGNATORY NAME IN PRINT | DATE |
|---|---|---|---|---|
| | | | DAVID LOMTATIDZE | 11/4/2017 |
| SIGNATURE OF CUSTOM REPRESENTATIVE | | | DATE SIGNED | SAMPLE NUMBER |
| | | | | 11/4/2017 |