```
 1
                IN THE UNITED STATES DISTRICT COURT
 2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3      _____
                                        :
 4      TMF TRUSTEE LIMITED,            : CASE NO:
                                        : 2:17-CV-9010
 5                     Plaintiff        : IN ADMIRALTY
                                        :
 6               -v-                    :
                                        :
 7      M/T MEGACORE PHILOMENA,         :
        her engines, boilers, tackles  :
 8      and other appurtenances, et     :
        cetera, in rem, HURRICANE       :
 9      NAVIGATION INC, a Marshall      :
        Islands Corporation, in         :
10      personam                        :
                                        :
11                   Defendants         :
        _____:
12

13                      Deposition

14                         Of

15               MR. Gregory Wauthier

16

             On Wednesday, April 25th 2018
17

18               Commencing at 1.37 pm

19

                      Taken at:
20

                     Reed Smith
21                The Broadgate Tower
                  20 Primrose Street
22                London EC2A 2RS
                  United Kingdom
23

24

25      Reported by: Miss Pamela Henley
```

```
 1    Job No.  201107

 1                A P P E A R A N C E S
 2

 3    On behalf of the Plaintiff:

 4              FLYNN, DELICH & WISE LLP

 5              One World Trade Center

 6              Suite 1800

 7              Long Beach, CA 90831-1800

 8              Telephone:  562 733 2373

 9              Email: erichw@fdw-law.com

10                   BY:  MR. ERICH P WISE

11

12              REED SMITH

13              The Broadgate Tower

14              20 Primrose Street

15              London EC2A 2RS

16              United Kingdom

17              Telephone:  +44(0)20 3116 3632

18              Email: cweller@reedsmith.com

19                   BY:  MR. CHARLES WELLER

20

21

22

23

24

25
```

**MR. GREGORY WAUTHIER on 04/25/2018**

```
 1          REED SMITH

 2          The Broadgate Tower

 3          20 Primrose Street

 4          London EC2A 2RS

 5          United Kingdom

 6          Telephone:  +44(0)20 3116 3473

 7          Email: jrwood@reedsmith.com

 8                BY:  MR. JODY R I WOOD

 9

10   On behalf of the Defendant Hurricane:

11          KAYE, ROSE & PARTNERS, LLP

12          9100 Wilshire Boulevard

13          Suite 420W

14          Beverley Hills, CA 90212

15          Telephone:  310 551 6555

16          Email: fbrucculeri@kayerose.com

17                BY:  MR. FRANK C BRUCCULERI

18

19          KAYE, ROSE & PARTNERS, LLP

20          402 West Broadway

21          Suite 1300

22          San Diego, CA 92101-3452

23          Telephone:  619 232 6555

24          Email: brose@kayerose.com

25                BY:  MR. BRADLEY M ROSE
```

```
 1   On behalf of the Defendant Novell Investments:

 2          McKASSON & KLEIN LLP

 3          2211 Michelson Drive

 4          Suite 320

 5          Irvine, CA 92612

 6          Telephone:  949 724 0206

 7          Email: neilk@mckassonklein.com

 8               BY:  MR. NEIL B KLEIN

 9

10   On behalf of the Witness:

11          Andrew Jamieson

12          Claims Director & Legal Advisor

13          International Transport Intermediaries

14          Management Company Limited

15          90 Fenchurch Street

16          London EC3M 4ST

17

18   In Attendance:     Mr. C Loukopoulos

19

20   Court Reporter:    Miss Pamela Henley

21

22

23

24

25
```

```
 1                    I N D E X

 2   DEPONENT

 3   Mr. Gregory Wauthier

 4   Examination:                         Page No:

 5   Examination by Mr. Wise                  7

 6   _____

 7                   EXHIBIT INDEX

 8

 9   Number                              Page No:

10   Exhibit 28    BRS market value opinion

11                 of Megacore Honami        15

12   Exhibit 29    BRS market value opinion

13                 of Megacore Philomena     19

14   Exhibit 30    letter from BRS re opinion

15                 of market value of Megacore

16                 Honami                    20

17   Exhibit 31    letter from BRS re opinion

18                 of market value of Megacore

19                 Philomena                 24

20   Exhibit 32    Declaration of Gregory

21                 Wauthier in support of

22                 TMF's opposition to vacate

23                 Arrest                    25

24   Exhibit 33    Email string             41

25   Exhibit 34    Email string             41
```

**MR. GREGORY WAUTHIER on 04/25/2018**

```
 1   Exhibit 35     Email string                41

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    Mr. Gregory Wauthier

 2                    having been duly sworn

 3                    testified as follows:

 4                     EXAMINED BY MR. WISE

 5                    MR. WISE:  Sir, can you state your

 6    name for the record, please.

 7          A.     My name is Gregory Wauthier.

 8          Q.     Can you spell that for us?

 9          A.     Gregory is G-R-E-G-O-R-Y.  Wauthier

10    W-A-U-T-H-I-E-R.

11          Q.     Mr. Wauthier, you are -- are you

12    appearing here today voluntarily?

13          A.     Yes, I am.

14          Q.     And do you have time constraints on

15    your appearance today?

16          A.     Yes, I have family duties.  I like

17    to leave around 6.00 pm.

18          Q.     All right. Let us get right to it

19    then.  By whom are you employed?

20          A.     BRS London.

21          Q.     And what is BRS?

22          A.     It stands for Barry Rogliano

23    Salles, and we are a shipbroking firm.

24          Q.     And how long have you worked there?

25          A.     About 8 years.  7 and a half years.
```

```
1              Q.      Did you -- what did you do before
2    you worked for BRS?
3              A.      I worked for a small company
4    providing technical shipping services.
5              Q.      And what company was that?
6              A.      The name of the company is Pole
7    Star Space Applications.
8              Q.      How long did you work there?
9              A.      3 or 4 years.
10             Q.      Right.  And were you employed
11   before that?
12             A.      I was, for a French company in the
13   London office, subsidiary of Natixis Bank.
14             Q.      What?
15             A.      Natixis Bank.
16             Q.      And before that?
17             A.      And before that was my first
18   position, and was cost controller for a distance
19   selling company in France called La Redoute.
20                     MR. BRUCCULERI:  What kind of
21   selling company?
22             A.      Distance selling.
23             Q.      Distance selling?
24             A.      Yes.
25   BY MR. WISE:
```

**MR. GREGORY WAUTHIER on 04/25/2018**

```
1              Q.     So have you worked in London for
2    BRS since you started with the company?
3              A.     No, I spent 5 years in Paris before
4    moving to London.
5              Q.     Is Paris the headquarters for the
6    company?
7              A.     Yes, it is.
8              Q.     And have you been in the same
9    position throughout the time you were at -- you
10   have been at BRS?
11             A.     Yes. Apart from that I became a
12   partner in the company.
13             Q.     Okay. When did you become a partner
14   in the company?
15             A.     3 years ago.
16             Q.     And -- but in terms of your duties
17   as an employee what -- have those changed over
18   time?
19             A.     Yes, they have.
20             Q.     Why do you not run through what you
21   have done for BRS since you started there?
22             A.     When you start, especially as a
23   junior broker, you do undertake what I would refer
24   as administrative duties, which is filling in
25   market reports into databases, assisting senior
```

```
 1    brokers on circulation of ships, working on market

 2    analysis.  And throughout time you get more

 3    independent and set up your own and develop your

 4    own clientele.

 5         Q.    All right. So how long did you do

 6    the preliminary work that you just described?  For

 7    how long was that your job?

 8         A.    2 to 3 years.

 9         Q.    Before I forget, is English your

10    first language?

11         A.    No.

12         Q.    What is your first language?

13         A.    French.

14         Q.    Do you feel comfortable giving your

15    deposition in English here today?

16         A.    I do.

17         Q.    And you would speak English in your

18    day-to-day business?

19         A.    Yes.

20         Q.    Okay. Why do not you describe what

21    your duties are presently for BRS?

22         A.    I sit in the sale and purchase

23    department of BRS, which is a shipbroking firm,

24    which means that overall my duty to the company is

25    to generate commission through the sale or the
```

```
 1   purchase of ships being an intermediary.

 2   BY MR. WISE:

 3        Q.    All right, does BRS do valuations

 4   of vessels?

 5        A.    Yes, we do.

 6        Q.    Do you do that for third-party

 7   clients?

 8        A.    Yes, we do.

 9        Q.    Who are the clients for whom you do

10   valuations?

11        A.    A large range of different type of

12   customers, but mostly lenders and international

13   ship owners.

14        Q.    All right. And how many valuations

15   does BRS do per year?

16        A.    Around 800 to 1,000.

17        Q.    And what percentage of those are

18   for tankers?

19        A.    I do not know.

20        Q.    Right.  Does BRS regularly do

21   valuations of tankers?

22        A.    Yes.

23        Q.    How many people in -- at BRS do

24   valuations?

25        A.    I would say that any employee in
```

1    the sale and purchase department can participate

2    in the issuance of valuations, so that is roughly

3    20 to 25 people.

4         Q.    And how about yourself, how many --

5    do you do valuations?

6         A.    I do.

7         Q.    How many of those do you do per

8    year?

9         A.    Anywhere from 10 to 30. On a direct

10   basis.

11        Q.    When you say, "direct basis" what

12   does that mean?

13        A.    That means that all valuation work

14   is collaborative, so not a single valuation will

15   leave the office without having it seen by several

16   people.  So I do participate to the output of my

17   colleagues, so that ends up in being many more

18   valuations.

19        Q.    Many more than 10 or 30?

20        A.    Yes.

21        Q.    So when you say, "direct basis" you

22   mean you personally are the director who is

23   responsible for it?

24        A.    I am the person to which the

25   request was addressed to.

```
 1              Q.      So by, "direct" you mean the
 2   request is directed to you?
 3              A.      Yes.
 4              Q.      Is there a procedure that you
 5   customarily follow in evaluating a vessel?
 6              A.      There is no process as such between
 7   the stone (sic).
 8              (Clarification by the reporter)
 9   But we do -- but we look at what we call benchmark
10   sales, which in the shipbroking world can also be
11   referred to as the last done, which refers to
12   units we deem as being similar that can be used as
13   data points.
14              It also is what we can refer to as
15   the market gossip, the market gossip, which we can
16   summarize as being our knowledge of the on-going
17   negotiations of ships
18              MR. BRUCCULERI:  Could you read back
19   that answer, please?
20              (Preceding answer read back)
21              THE WITNESS:  I just meant as set
22   in stone. There is no process set in stone.  I
23   will try to speak a bit more higher.
24              MR. BRUCCULERI:  If you would not
25   mind.
```

```
 1                    THE WITNESS:  No, that is okay.
 2    Market gossip. Which is market information, so we
 3    know which ships, or we try to know which ships
 4    are being negotiated at what levels.  This is the
 5    day-to-day of the life of the sale and purchase
 6    broker.
 7                    And then there is also market
 8    knowledge, which means which ships are out there
 9    for sale, at what levels, and we know what levels
10    can trigger or not interest from market interest
11    or not.  So it gives us an idea of where the
12    values can be.
13                    There is also -- and there are also
14    any other elements, shipping-related, that we can
15    deem as being relevant in valuing a vessel.
16    BY MR. WISE:
17         Q.    Do you do anything to investigate
18    the characteristics of ships that are being
19    evaluated?
20         A.    I am sorry?
21         Q.    Do you do anything to investigate
22    the characteristics of ships that are being
23    valued?
24         A.    Well, we always look at the ship we
25    are asked to value. We look at it through our
```

1    database.  And if we feel we do not know that ship

2    or that type of ship enough we also go through

3    additional documents.

4          Q.    Do you actually inspect the vessels

5    before you value them?

6          A.    No, we do not.

7          Q.    Of the 800 per year that you -- 800

8    to 1,000 per year that you value, do you ever

9    inspect the vessel before you provide a valuation?

10         A.    No, we do not.

11         Q.    So I have marked as Exhibit 27 --

12               THE COURT REPORTER:  28.

13               MR. WISE:  I am sorry, Exhibit 28, a

14   document which I ask you to look at before the

15   witness.

16      (Exhibit 28 marked for identification)

17         A.    Thank you.

18         Q.    Can you tell me what that document

19   is, please?

20         A.    It is a valuation provided by our

21   group which I have signed of the vessel Megacore

22   Honami dated 6th October 2016.

23         Q.    And did you undertake this at the

24   request of anyone?

25         A.    Yes, I did.

1          Q.      Who?

2          A.      TMF Group.

3          Q.      And by whom at TMF Group were you

4    contacted?

5          A.      Mrs Sue Dalton.

6          Q.      And what were you asked to do?

7                  MR. KLEIN:  Excuse me, could we --

8    Erich, what document are you referring to?  I do

9    not have a copy of that document.

10                 MR. WISE:  I am not referring to any

11   document.  I am just asking.

12                 MR. KLEIN: You just handed him a

13   document.

14                 MR. WISE:  Oh, I am sorry, he just

15   identified it.  It is the October 6th, 2016

16   valuation of Honami.

17                 MR. KLEIN:  But you have not

18   provided us with copies of it.

19                 MR. WISE:  You should have copies of

20   it.

21                 MR. KLEIN:  I have 2017.

22                 MR. WOOD:  Yes, that was not in the

23   pack I gave. I think Erich gave you that right at

24   the beginning.

25                 MR. WISE:  I thought I gave those to

```
 1   you.  No?
 2                   MR. KLEIN:  No, I did not get a copy
 3   of that.
 4                   MR. BRUCCULERI:  I have one.
 5                   MR. KLEIN:  Do you have an extra
 6   copy there?  I have two copies of the others, but
 7   not that one.
 8                   MR. WISE:  I do not.  I thought I
 9   gave Frank all of them.
10                   MR. WOOD:  Are they at your end,
11   Erich?
12                   THE COURT REPORTER:  Do you want to
13   go off the record for a moment?
14                   MR. WISE:  Yes, let us go off the
15   record.
16              (Off the record at 1.52 pm)
17                   (Recess taken)
18             (On the record at 1.53 pm)
19                   MR. WISE:  If you look at
20   Exhibit 28.
21                   MR. BRUCCULERI:  I was not here when
22   you marked Exhibit 28.
23                   MR. WISE:  28 was the document --
24                   MR. KLEIN:  Is that the Honami?
25   BY MR. WISE:
```

```
 1           Q.      Which one do you have?

 2           A.      October 6th, 2016, Honami

 3    valuation.

 4           Q.      Looking at Exhibit 28, did you

 5    prepare that document?

 6           A.      No.

 7           Q.      Okay. Who did?

 8           A.      Our assistant in Paris.

 9           Q.      Ah. Okay. So did you undertake the

10    valuation that is shown in the document?

11           A.      Yes.

12           Q.      What did you do to undertake that

13    valuation?

14           A.      Well, I do not specifically

15    recollect, it is 2 years ago valuation, but I did

16    go through the steps I mentioned earlier.

17                   Also compared my opinion to my

18    colleagues in Paris, and after we all agreed on

19    the value this is what was put on the certificate.

20           Q.      And what does this certificate show

21    with respect to the value?

22           A.      $17.5 to $18 million.

23           Q.      And if you look at the last page is

24    that your signature on this document?

25           A.      Yes, it is.
```

```
 1          Q.     So the next which we will mark next
 2     in order 29.
 3          (Exhibit 29 marked for identification)
 4     This is an October 6th valuation of the Philomena,
 5     do you see that?
 6          A.     I do.
 7          Q.     Can you tell me what this is?
 8          A.     This is a valuation for $26.5 to
 9     $27 million for the vessel Megacore Philomena
10     dated 6th October 2016, issued by our group signed
11     by myself.
12          Q.     Okay. And what did do to prepare
13     this valuation?
14          A.     I went through the steps I
15     mentioned earlier about the process, shared my
16     opinion, and discussed it at the time with my
17     colleagues.  And this is the value we came up
18     with -- that we forged, and that we issued on the
19     certificate.
20          Q.     And if you go to the last page, is
21     that your signature on the last page?
22          A.     It is.
23          Q.     And what was the valuation?
24          A.     $26.5 to $27 million.
25          Q.     And it is of the Megacore
```

1    Philomena?

2          A.     Yes.

3          Q.     Let us mark the next in order as

4    Exhibit 30.

5          (Exhibit 30 marked for identification)

6    Can you tell me what this is?

7          A.     This is valuation certificate

8    issued by our group for the vessel Megacore Honami

9    for $17.5 million dated 25th August 2017.

10         Q.     Looking at the last page of this

11   document your name is on that document?

12         A.     Yes, it is.

13         Q.     Is that your signature?

14         A.     No, it is not.

15         Q.     Do you know who signed that?

16         A.     Yes, I strongly believe it is

17   Thierry Charvet.

18         Q.     And who is Thierry Charvet?

19         A.     He is another member of the sale

20   and purchase team in Paris, also one of our

21   managing partners and a board member.

22         Q.     And how long has he worked at BRS,

23   if you know?

24         A.     I do not, but more than 25 years.

25         Q.     Okay. How did it come about that he

```
 1   signed this document over your name?
 2           A.      The reason for that is the Paris
 3   office is consolidating the issuance of the
 4   certificates, and that I sit in the London office,
 5   and I was not in the office in London at the time
 6   of the valuation request, so each time we have a
 7   valuation request hitting one of the foreign BRS
 8   office we go through the comparison of our
 9   opinions, we talk about it, but Paris will be
10   issuing it, and one of the Paris team members will
11   be signing it.
12           Q.      So did you participate in the
13   valuation of the vessel that is shown on
14   Exhibit 30?
15           A.      Yes, I did.
16           Q.      And tell us what your participation
17   was with respect to that certificate?
18           A.      I -- when I received the valuation
19   request I shared the request with the team in
20   Paris, and we had a few calls discussing about
21   what the value we wanted to put on the
22   certificate.
23           Q.      And who did you talk to at the
24   Paris office?
25           A.      At the Paris office I talked to
```

```
 1   Thierry Charvet, and I also talked to Nicos
 2   Ritsos.
 3           Q.      And which office is he in?
 4           A.      He is in the Paris office as well.
 5           Q.      Did you work with MR. -- with Nicos
 6   and MR. Charvet in the past?
 7           A.      Yes, constantly.
 8           Q.      When you say, "constantly" what do
 9   you mean by that?
10           A.      Other shipbroking offices --
11   companies when they have several office usually
12   those office are competitive.  We are not.  So our
13   system is inclusive.  So I know what they do.
14   They know what I do.  And we closely work together
15   despite the distance. So I talk to them every day.
16           Q.      Do you remember your conversations
17   regarding the valuation which appears in
18   Exhibit 30?
19           A.      Not in detail, but, yes, mostly --
20   well, with Nicos Ritsos he was on holiday too at
21   the time, and although I talked to him we did not
22   talk about the valuation itself. He asked me just
23   to see with Thierry who was sitting in the office,
24   and we discussed with Thierry on a couple of
25   occasions that day. Discussing our sentiments,
```

1   discussing the market positioning, and also trying

2   to ensure we put a fair value.

3          Q.    Right.  And what was the value that

4   the certificate puts on the -- put on the Honami

5   at that time?

6          A.    $17.5 million.

7          Q.    Did you agree with that valuation?

8          A.    Yes.

9          Q.    So, just so I am clear, your name

10  is on here as --

11         A.    Mmm hmm.

12         Q.    -- with respect -- why is your name

13  on here if it is signed-off by MR. Charvet?

14         A.    Because the request was sent to me,

15  and our process, however, was the valuations to be

16  sent from a Paris office and printed and signed

17  over there.  This is the reason why.

18         Q.    Okay. Did you -- who did you

19  receive the request from?

20         A.    Claudia Small.

21         Q.    And where -- Claudia Small at what

22  company?

23         A.    TMF.

24         Q.    Do you remember what the -- no, we

25  will get to that.

```
 1                    So looking at exhibit -- what we
 2     will mark as Exhibit 31, which will be the
 3     August 25, 2017 valuation of the Philomena.
 4            (Exhibit 31 marked for identification)
 5     If you look at Exhibit 31, MR. Wauthier?
 6            A.     Yes.
 7            Q.     Can you tell me what this is?
 8            A.     This is a valuation certificate
 9     issued by our group dated 25th August 2017, for
10     the vessel Megacore Philomena for a value of
11     $24 million with my name, but signed by
12     MR. Charvet.
13            Q.     Right. Can you tell me what your
14     involvement was in the preparation of -- or the
15     valuation that is reflected in Exhibit 31?
16            A.     We did value Megacore Honami and
17     Megacore Philomena at the same time, so exactly
18     the same one as for Exhibit 30.
19            Q.     Meaning what?
20            A.     Meaning that we had several
21     conversations with my colleagues from the Paris
22     office, but mostly MR. Thierry Charvet on the day,
23     and we talked about the vessels, the market
24     situation or sentiment, and what valuation we
25     should put on the certificate.
```

1          Q.     And what was the valuation that was
2     on the certificate?
3          A.     $24 million.
4          Q.     Did you agree with that valuation?
5          A.     Yes, I did.
6          Q.     All right. Let us move on and mark
7     as Exhibit 32 the declaration you submitted --
8     submitted by us, your declaration in the Central
9     District of California.
10         (Exhibit 32 marked for identification)
11              MR. KLEIN:  The one with EPW stamp
12     on it?  (Pause).
13     BY MR. WISE:
14         Q.     Looking at Exhibit 32, do you
15     recognize that document?
16         A.     I do.
17         Q.     And what is that?
18         A.     It is my declaration with regards
19     to some challenge that was received on the
20     description of the two vessels.
21         Q.     Right.  And looking at the
22     page number 7 of the exhibit, would you do that?
23         A.     Yes, of course.
24         Q.     Is that your name and signature at
25     the bottom?

```
 1            A.      Yes, it is.
 2            Q.      Can you tell me how this
 3    declaration came to -- was prepared? What did you
 4    do to prepare this declaration? I guess what I
 5    should mean is, first of all, did you type -- you
 6    did not -- or did you type out this declaration?
 7            A.      I -- sorry, I am not sure I
 8    understand.
 9            Q.      Yes, I am just trying to get, sort
10    of, the basic point, which is, did you type --
11            A.      We received a question, the
12    challenges, or the list of challenges from the
13    owners.  We looked into it, myself and my
14    colleague, Thierry Charvet, and we -- I believe I
15    emailed, sent our replies back and this was
16    formatted for us.
17            Q.      -- all right. So who did you -- who
18    did you receive the challenges from? Who gave that
19    to you?
20            A.      By, I think, Reed Smith.
21            Q.      Who?
22            A.      Reed Smith.
23            Q.      Who?
24            A.      Reed Smith. Yes.
25            Q.      All right.  And once you received
```

1   that challenge what did you do?

2          A.     We looked at the challenges

3   themselves, took them point by point, and we

4   explained why it was they were not material.

5          Q.     When you say, "we" who are you

6   talking about?

7          A.     Myself and MR. Charvet. At this

8   stage this was also overlooked by MR. Cadiou, who

9   is head of new building and head of sale and

10  purchase and BRS CEO.

11              MR. BRUCCULERI:  Can you repeat the

12  last part of that?

13         A.     And he is also the CEO of the

14  company.

15              MR. BRUCCULERI:  Okay. Thank you.

16  BY MR. WISE:

17         Q.     So in preparing this declaration

18  you conferred with your colleagues, MR. Charvet and

19  MR. Cadiou?

20              MR. BRUCCULERI:  Objection, assumes

21  facts.  Lacks foundation.  Argumentative as

22  phrased.

23  BY MR. WISE:

24         Q.     In preparing this who did you

25  confer with with respect to the items that are in

```
 1   this declaration?
 2              MR. BRUCCULERI:  Same objection.
 3        A.    MR. Charvet.
 4              MR. WISE:  Right.
 5        Q.    And what did you --
 6        A.    I am sorry, maybe MR. Ritsos was
 7   involved, but I am not sure about that point.
 8        Q.    -- all right.  And after you --
 9   what -- after you conferred with MR. Charvet and
10   potentially MR. Ritsos what did you do?
11        A.    We wrote the replies to the
12   challenges and we sent them back.
13        Q.    Sent them back to whom?
14        A.    To Reed Smith.
15        Q.    All right.  Let us look at the
16   substance of this declaration, starting at the
17   beginning it says that you are partner and broker
18   at Barry -- how do you pronounce that?
19        A.    Barry Rogliano Salles, but we say
20   "BRS" ourselves.
21        Q.    Okay. And your -- and you say where
22   you are located, correct?
23        A.    Correct.
24        Q.    Well, let me ask you this, did Reed
25   Smith assist you in preparing this document?
```

MR. GREGORY WAUTHIER on 04/25/2018

```
 1          A.      No, not on its content.
 2          Q.      Did they -- what did they do, if
 3   anything, when you sent it back to them?
 4          A.      Nothing.
 5          Q.      All right. Well, I guess what I am
 6   asking is it appears in the format of a
 7   declaration printed under the heading of our firm,
 8   my firm, and the -- ultimately the -- this was
 9   presented to the court as a document from my law
10   firm?
11             (Clarification by the reporter)
12          Q.      How did -- did you sign it in that
13   format?
14          A.      Yes, I did.
15          Q.      And who presented it to you in that
16   format?
17              MR. JAMIESON:  Do you understand the
18   question? Was it on this form?
19              THE WITNESS:  Yes, actually I
20   specifically remember it was on this form. Someone
21   whom I assume was working for Reed Smith came with
22   a hard copy of the declaration we had agreed to
23   sign, and I signed it.  So what we had sent via
24   email got reformatted in that document.
25   BY MR. WISE:
```

```
 1          Q.    So the substance of this was
 2    something that you sent by email?
 3          A.    Yes.
 4          Q.    And who did you send that to?
 5          A.    Well, I am not sure, but I think
 6    Charles Weller.
 7          Q.    And then what came back to you was
 8    this -- was the document in this format?
 9          A.    Yes.
10          Q.    All right.
11                MR. BRUCCULERI:  Counsel, can I
12    interrupt?
13                MR. WISE:  Sure.
14                MR. BRUCCULERI:  Again, is there any
15    reason why we have not been provided with the
16    correspondence?  There is no potential claim if it
17    is privileged in my view.  You are asking the
18    witness about --
19                MR. WISE:  Well, you just asked for
20    it.  So we will get it for you. So let us go
21    through the document then.
22          Q.    First paragraph it describes your
23    position at BRS, correct?
24          A.    Correct.
25          Q.    And then the -- it also describes
```

```
 1   how -- your background and your work there since
 2   2010, correct?
 3           A.      Correct.
 4           Q.      And is that information all true
 5   and correct? It is in paragraphs 1 and 2.
 6           A.      Yes, it is.
 7           Q.      All right.  And paragraph 3 is --
 8   describes the BRS Group, correct?
 9           A.      It is correct.
10           Q.      And what -- is that a correct
11   description of BRS in that paragraph?
12           A.      Yes, it is.
13           Q.      And going on to paragraph 4, it
14   also provides further information.  And paragraph
15   5 further information regarding BRS and its work,
16   correct?
17           A.      That is correct.
18           Q.      And did you -- is that information
19   all -- that appears in paragraphs 3, 4 and 5, is
20   that all correct information?
21           A.      It is.
22           Q.      Right.
23           A.      We actually have a couple of more
24   offices, so it is -- that is the only thing I
25   would change.
```

```
 1          Q.      Right. And where are those offices?
 2          A.      We opened one in Columbia.
 3          Q.      Where in Columbia?
 4          A.      In Bogota, I think.
 5          Q.      All right.  Let us go to Paragraph
 6    6 then.
 7          A.      Yes.
 8          Q.      And looking at Paragraph 6, can you
 9    tell me -- let me ask this, did you receive
10    instructions from TMF?
11          A.      Yes, I did.
12          Q.      And what were those instructions?
13          A.      Shall I read? Or -- they were
14    asking me, there was an email addressed to me
15    asking me to value Megacore Philomena and Megacore
16    Honami.
17          Q.      And is that -- does paragraph 6
18    quote that request properly?
19          A.      It is a request, yes.
20          Q.      All right. And looking at paragraph
21    7, and we have already looked at those valuations,
22    did you -- had you -- the two vessels that -- for
23    which the request was made, did you previously
24    provide those -- provide valuations to TMF for
25    those vessels?
```

**MR. GREGORY WAUTHIER on 04/25/2018**

```
 1              A.      Yes.
 2              Q.      So in preparing the valuations --
 3    well, we already know that you did not actually
 4    prepare the document which is the valuations sent
 5    to TMF on August 25, did you -- were the
 6    instructions followed with respect to the
 7    valuations?
 8              A.      I am sorry, I do not understand.
 9              Q.      Were the instructions provided by
10    the email of -- from TMF, were they followed in
11    preparing the valuations for the Megacore
12    Philomena and the Megacore Honami in August of
13    2017?
14              A.      Yes, we followed.
15              Q.      Going to paragraph 9, again, you
16    were advised by Reed Smith that the owners had
17    challenged the declarations based upon errors and
18    material discrepancies, right?
19              A.      That is correct.
20              Q.      And when you were advised that did
21    you review a declaration from MR. Loukopoulos
22    regarding those valuation errors and
23    discrepancies?
24              A.      Yes.
25              Q.      And then what did you do next after
```

```
 1   you looked at that declaration for MR. Loukopoulos?
 2          A.      We worked on our reply point by
 3   point.
 4          Q.      And when you say, "we worked on"
 5   your "reply point by point" who is "we"?
 6          A.      MR. Thierry Charvet and myself.
 7          Q.      And looking at paragraph -- looking
 8   at paragraphs 10 through 14, what did those
 9   paragraphs represent?
10          A.      They do represent our reply point
11   by point to the several alleged discrepancies on
12   the vessel Megacore Philomena.
13          Q.      And do those paragraphs accurately
14   state what you replied to those allegations were?
15          A.      Yes, they do.
16          Q.      All right.  And how about in
17   paragraphs 15 through 17, what do those represent?
18          A.      Our explanations as BRS how
19   MR. Thierry Charvet and myself on the point by
20   point basis explaining on the vessel Honami why
21   the alleged differences do not appear material.
22          Q.      And do those paragraphs correctly
23   state your response to MR. Loukopoulos's
24   allegations regarding the alleged discrepancies
25   and errors in the valuation?
```

```
 1          A.     Yes.

 2          Q.     After reading MR. Loukopoulos's

 3   deposition -- or declaration did you have any --

 4   did you consider changing the valuation or the

 5   terms of the valuation?

 6          A.     Absolutely not.

 7          Q.     Why not?

 8          A.     Because we valued the vessel.  We

 9   were familiar with the vessel -- the vessels, I

10   apologise, on the one hand.

11                 And on the other hand, those

12   alleged material differences do not appear

13   material at all to us, and are not material.

14          Q.     Are not --

15          A.     To the valuation of the vessel.

16                 MR. BRUCCULERI:  I missed a word,

17   are not what?

18          A.     Material.

19                 MR. BRUCCULERI:  I got "material".

20   There was another word. Unless he said, "material"

21   twice.

22                 MR. JAMIESON:  I think he did

23   actually. She can read it back.

24            (Preceding answer read back)

25   BY MR. WISE:
```

```
 1          Q.     And does your declaration state the
 2   reason why you think they are not material?
 3          A.     Yes.
 4          Q.     All right. Looking -- there are
 5   also some exhibits attached to your declaration.
 6          A.     Yes.
 7          Q.     Can you -- there -- Exhibit 1 is
 8   a ... is an 8 page document and can you -- it
 9   is -- at the top it says:
10                 "Intertanko's standard tanker
11   chartering questionnaire 88 (Q88) version 4."
12                 Do you see that?
13          A.     I do.
14          Q.     Can you tell me what that document
15   is?
16          A.     This document is an industry
17   recognized standard document that enables to be
18   exhaustive on the description of a vessel.
19          Q.     All right.  And what is the
20   significance of this Q88 form with respect to the
21   valuations that you prepared, or that were
22   prepared by BRS in August of 2017?
23          A.     When we look at a vessel we have to
24   value, and here we are talking about a Q88.  So
25   when we look at a tanker we have to value.
```

```
 1                    We refer to also relevant
 2   documentations on top of databases and market
 3   knowledge et cetera. And if we ever are seeking
 4   any specific information on the vessel we can
 5   refer to that.
 6           Q.      Okay. And this 9 page document
 7   includes information regarding which vessel?
 8           A.      The Megacore Philomena.
 9           Q.      And is the -- what is the
10   significance of the Q88?  What is a Q88?
11           A.      I am sorry, I do not understand.  I
12   think I am going to repeat myself. It is the -- a
13   description of the vessel, but in -- of a tanker,
14   but in a format that is recognized within the
15   whole of the tanker industry on the owner and
16   charterer side.  So that there is a consistent way
17   of describing the ships.
18           Q.      And who provides the Q88 form?
19           A.      The owners provide the information
20   of the Q88 form, but the form itself is also --
21   and is available through the Q88 service which is
22   a subscription service Web based.
23           Q.      Are the Q88s used at all in
24   connection with valuations in the industry?
25   Broking industry?
```

1        A.      Are they?

2        Q.      Are they used in connection with

3    the valuations of ships in the broking industry?

4        A.      They may be used.

5        Q.      Okay. Is it something that is

6    routinely used in the industry?

7        A.      If you do not know the vessel.

8        Q.      All right. In preparing the

9    valuations that we have looked at, 28 through 32,

10   did you look at the Q88 for the Philomena and

11   Honami at all?

12       A.      I personally did not access it.  I

13   went through -- I discussed with Thierry -- with

14   MR. Charvet over the phone on the database and on

15   the market. We -- and I looked at it when

16   preparing my reply to the declaration that was

17   submitted.

18       Q.      So let me ask, what I am trying to

19   get at is, if you look at Exhibits 28 and 29, both

20   of those include a description of some of the

21   characteristics of the vessel -- of the vessels,

22   right?  Look at 28 and 29 for me.  (Same handed)

23       A.      Okay.

24       Q.      So if you look at 28?

25       A.      Yes.

```
 1            Q.      There is a description of the
 2     Honami, correct?
 3            A.      Correct.
 4            Q.      It says, "MAI FLAG", is that right?
 5            A.      Yes.
 6            Q.      Is that information that appears in
 7     the Q88?
 8            A.      Well, it is not information that is
 9     taken from the Q88, it is taken from our database.
10            Q.      Ah.  Okay. So you have a separate
11     database at BRS?
12            A.      Yes.
13            Q.      And, similarly, I guess my next
14     question is, there is a substantial amount of
15     information regarding the characteristics of the
16     ship, the Honami, that appears in Exhibit 28 at
17     the heading of that valuation, right?
18            A.      Yes.
19            Q.      Where does that information come
20     from?
21            A.      Our database.
22            Q.      And does your database include
23     information from the Q88s?
24                    MR. BRUCCULERI:  Objection, lacks
25     foundations.  Calls for speculation.
```

```
 1                    MR. WISE:  Go ahead.
 2          A.       Our database may have overlapping
 3   information from the Q88, but the source of
 4   information from that database is Lloyd's Fair
 5   Play. What we call Lloyd's Fair Play.
 6          Q.       And when you say, "Lloyd's Fair
 7   Play", what do you mean by that? What is...
 8          A.       I rarely enquired until then, so it
 9   is an organism.  I do not know where.  That is
10   just updating on a quarterly basis our database
11   through a feed.  Our vessels change names, change
12   flag et cetera, new vessels come to the market, so
13   this is the feed of the database.
14          Q.       Right.  So Lloyd's Fair Play, you
15   have -- BRS has set it up so Lloyd's Fair Play
16   data feeds into the database?
17          A.       Sorry, I listened to the water. I
18   did not listen to your question.
19          Q.       Sure.  Are you saying that Lloyd's
20   database regarding vessel characteristics feeds
21   into the database at BRS?
22          A.       Yes. Third-party information
23   provider whom I strongly believe is Lloyd's Fair
24   Play.
25          Q.       Okay. Looking at Exhibit 2 to
```

```
 1   Exhibit 32, looking at Exhibit 2 to the -- your

 2   exhibit -- your declaration, can you tell me what

 3   that is, please?

 4          A.     It is a Q88 for the vessel Megacore

 5   Honami.

 6                 MR. WISE:  All right, why do not we

 7   take a break.

 8          (Off the record at 2.32 pm)

 9               (Recess taken)

10           (On the record at 2.40 pm)

11                 MR. WISE:  Back on the record

12   everybody.

13                 MR. Wauthier, we have marked as

14   Exhibits 33, 34 and 35 exchanges of emails between

15   you and Reed Smith that I think you referred to

16   earlier, so I want to confirm all that.

17          Q.     Looking at Exhibit 33 do you

18   recognize that as an email string exchange between

19   you and MR. Weller?

20          A.     Yes, in addition to direct messages

21   between MR. Weller and my colleague, Thierry

22   Charvet.

23          Q.     When you say, "direct messages"

24   what do you mean by that?

25          A.     The email string referred to is
```

1   between MR. Weller and myself.  The string is also

2   between MR. Weller and MR. Charvet on which I am

3   copied.

4            Q.      Okay. Right. So if you look at

5   Exhibit 33 if you go down to page 3 of 33.

6            A.      Yes.

7            Q.      Well, let us go down even further,

8   go down to page 5, I am -- page -- I am sorry,

9   page 3. I am sorry, go to page 5 of Exhibit 32.

10  Looking at page 5, that is the first in this email

11  string of emails from MR. Weller to you, is that

12  right?

13           A.      Yes, it is.

14           Q.      Was this the first time you had

15  heard about anything to do with this litigation

16  and the request for your declaration?

17           A.      I knew the vessel was arrested.  It

18  is the first time on the declaration, yes.

19           Q.      So looking at this first email of

20  February 2nd, 2018, at 14.33 from MR. Weller to

21  yourself, had you prior to this receipt of this

22  email been advised that the owners were taking

23  issue with your valuations?

24           A.      No.

25           Q.      So this was your first notice of

1   that?

2          A.      Yes.

3          Q.      And when you received this message

4   did you review the challenges that were being made

5   to your valuation?

6          A.      Yes.

7          Q.      Earlier you had said that you had

8   received a copy, I think maybe you testified that

9   you received a copy of MR. Loukopoulos's

10  declaration, did you ever receive a copy of his

11  declaration?

12         A.      Yes, but not that day.  So, yes, I

13  was wrong earlier in my ...

14         Q.      So it was later you did?

15         A.      It was later that I did.

16         Q.      And after you reviewed the email of

17  2nd February 2nd at 14.33 did you respond to that

18  email?

19         A.      Yes.

20         Q.      I think that starts at page 3.

21         A.      Yes.

22         Q.      And is the email that starts at

23  page 3 and continues on down to the bottom of

24  page 4, is that the response that you prepared to

25  MR. Weller's first email?

```
 1          A.     Yes, it is.
 2          Q.     What did you do to prepare that
 3   response?
 4          A.     We -- my apologies -- compared the
 5   alleged differences, and went into detail on each
 6   of them and looking at the database, at the Q88 et
 7   cetera to reconcile and explain.
 8          Q.     Okay. And so who prepared the --
 9   you say:
10                 "We would like to highlight the
11   following points."
12                 And then you have a -- the
13   substance of the rest of the email is those
14   responses, correct?
15          A.     Correct.
16          Q.     Who prepared those responses?
17          A.     Thierry Charvet and myself.
18          Q.     Was it -- was that a collaborative
19   effort?
20          A.     It was led by him.
21          Q.     Did MR. Weller give you any input as
22   to what you should say?
23          A.     Absolutely not. No.
24          Q.     The next email is from -- just
25   above that on page 3 -- is the February 5, 2018,
```

```
 1   at 16.28 and he is asking you a question here, do
 2   you see that?
 3            A.    I do.
 4            Q.    And that is the -- he wants to know
 5   if you were prepared -- whether you will give a
 6   declaration for the proceedings in Los Angeles,
 7   right?
 8            A.    Mmm hmm.
 9            Q.    And did you respond to that?
10            A.    Yes, I did.
11            Q.    Sounds like it was a memorable day?
12            A.    Yes. I had forgotten that.
13            Q.    So on February 5, 2018, at 7.25 you
14   did respond?
15            A.    Yes, I did.
16            Q.    And you told him that you were at
17   the hospital where your wife was delivering,
18   right?
19            A.    Right.
20            Q.    So a memorable day.
21                  And then the next email in the
22   string that is of substance is on February 6th,
23   2018, at 19.31 do you see that? On page 1?
24            A.    I do.
25            Q.    And it says:
```

```
 1                    "We attach a draft of the
 2      Declaration for your review."
 3                    Do you see that?
 4           A.    I do.
 5           Q.    And at the back, after the email
 6      string at the back of Exhibit 33 there is a
 7      document that says:  Draft/Brokers' Declaration,
 8      right?
 9           A.    Yes, indeed.
10           Q.    And did you receive this from
11      MR. Weller?
12           A.    Yes, I did.
13           Q.    And after receipt what did you do?
14           A.    I -- well, I do not remember, but
15      we would have reviewed it, read it and certainly
16      made a few comments back.
17           Q.    Okay.
18           A.    But that is an assumption.  I do
19      not recollect exactly what I did after that.
20           Q.    Okay. But it looks like there is a
21      response to MR. Weller's email from MR. Charvet,
22      right?
23           A.    Right.
24           Q.    So you were unavailable, I take it,
25      because of your family circumstances at that time?
```

```
 1          A.      Mmm hmm.
 2          Q.      Okay. So the next exhibit is
 3   Exhibit 34, which is -- at the top of that there
 4   is a February 8, 2018, at 10.23?
 5          A.      Yes.
 6          Q.      Do you see that?
 7          A.      I do.
 8          Q.      And that appears to be a response
 9   to the earlier attached declaration -- email
10   attaching the declaration, correct?
11          A.      It is correct.
12          Q.      And you -- after you reviewed the
13   draft sent to you by Charles Weller what did you
14   do?
15          A.      We commented it and sent back our
16   comments.
17          Q.      All right. And you sent back -- you
18   say:
19                  "Please enclose" -- "please find
20   enclosed the renewed draft BRS/I are happy with."
21                  Do you see that?
22          A.      I do.
23          Q.      If you go to the back of the email
24   string here there is a draft brokers' declaration,
25   do you see that?
```

1        A.      I do.

2        Q.      Did you make any changes to the

3    original draft, if you recollect?

4        A.      I do not recollect, but we usually

5    do.

6        Q.      Okay. All right.  But you sent back

7    the -- as an attachment this brokers' declaration

8    which appears after page 6 of Exhibit 34, correct?

9        A.      It is correct.

10       Q.      All right. Now, looking at

11   Exhibit 35, and that is -- it has at the top -- I

12   am sorry, 35, has at the top an email from Charles

13   Weller dated February 8th, 2018 at 10.50, do you

14   see that?

15       A.      Yes, I do.

16       Q.      And you received that -- did you

17   receive that on February 8th?  Or when did you

18   receive that document?

19       A.      That email?

20       Q.      That email, right.

21       A.      That day.

22       Q.      All right. And he is making an

23   enquiry to you about the Q88, correct?

24       A.      Correct.

25       Q.      Did you respond to that enquiry?

```
 1          A.      I think I gave him a call.
 2          Q.      Okay. And when you gave him a call
 3   what did you talk about?
 4          A.      That I did not have one.
 5          Q.      Right. And ... Now, you executed
 6   Exhibit 32, did you sign it after you received the
 7   email at 10.50 on February 8th?
 8          A.      Yes, I did.
 9          Q.      And did you retain a copy of that
10   in your files of that signed declaration?
11          A.      I do not remember.  I would ...
12   yes, yes, they gave me -- he gave me two hard
13   copies and one for my files.
14          Q.      And did you then sign it and send
15   it back?
16          A.      A representative of Reed Smith came
17   with two hard copies, one which I signed in order
18   to -- I kept one and he left with the other one.
19                  MR. WISE:  Okay. That is all I have.
20                  MR. BRUCCULERI:  I want to get
21   myself organized. Talk with these guys for a few
22   minutes, and then we will start.
23                  (Off the record at 3.33 pm)
24                  (Recess taken)
25    (Subsequently decided to adjourn deposition to a
```

```
 1    date to be determined)

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                   CERTIFICATE OF WITNESS

 2

 3

 4

 5

 6                   I, Gregory Wauthier, am the witness

 7   in the foregoing deposition. I have read the

 8   foregoing deposition and, having made such changes

 9   and corrections as I desired, I certify that the

10   transcript is a true and accurate record of my

11   responses to the questions put to me on Wednesday,

12   April 25th 2018.

13

14

15

16

17   Signed_____

18        Gregory Wauthier

19   Dated this _____ day of_____ 2018

20

21

22

23

24

25
```

```
 1              CERTIFICATE OF COURT REPORTER

 2

 3              I, Pamela E Henley, Court Reporter,

 4   do hereby certify that I took the stenotype notes

 5   of the foregoing deposition and that the

 6   transcript thereof is a true and accurate record

 7   transcribed to the best of my skill and ability

 8              I further certify that I am neither

 9   counsel for, related to, nor employed by any of

10   the parties to the action in which this deposition

11   was taken, and that I am not a relative or

12   employee of any attorney or counsel employed by

13   the parties hereto, nor financially or otherwise

14   interested in the outcome of the action.

15

16

17

18

19

20

21              _____

22                   Pamela E Henley

23

24

25                        ERRATA
```

**MR. GREGORY WAUTHIER on 04/25/2018**

```
 1    (Please make any amendments or corrections on the

 2    errata sheet and not on the original deposition)

 3   CORRECTION                                      PAGE

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20   _____        _____

21

22   Signature                    Date

23

24

25
```

MR. GREGORY WAUTHIER on 04/25/2018

**Exhibits**

**WauthierG 28**
  5:10
  15:13,16
  17:20,22
  18:4 39:16

**WauthierG 29**
  5:12 19:3

**WauthierG 30**
  5:14 20:4,
  5 21:14
  22:18
  24:18

**WauthierG 31**
  5:17 24:2,
  4,5,15

**WauthierG 32**
  5:20 25:7,
  10,14 41:1
  42:9 49:6

**WauthierG 33**
  5:24 41:17
  42:5 46:6

**WauthierG 34**
  5:25 47:3
  48:8

**WauthierG 35**
  6:1 48:11

**$**

**$17.5**  18:22
  20:9 23:6

**$18**  18:22

**$24**  24:11
  25:3

**$26.5**  19:8,
  24

**$27**  19:9,24

**1**

**1**  31:5 36:7
  45:23

**1,000**  11:16
  15:8

**1.52**  17:16

**1.53**  17:18

**10**  12:9,19
  34:8

**10.23**  47:4

**10.50**  48:13
  49:7

**14**  34:8

**14.33**  42:20
  43:17

**15**  34:17

**16.28**  45:1

**17**  34:17

**19.31**  45:23

**2**

**2**  10:8
  18:15 31:5
  40:25 41:1

**2.32**  41:8

**2.40**  41:10

**20**  12:3

**2010**  31:2

**2016**  15:22
  16:15 18:2
  19:10

**2017**  16:21
  20:9 24:3,
  9 33:13
  36:22

**2018**  42:20
  44:25
  45:13,23
  47:4 48:13

**25**  12:3
  20:24 24:3
  33:5

**25th**  20:9
  24:9

**27**  15:11

**28**  15:12,
  13,16
  17:20,22,
  23 18:4
  38:9,19,
  22,24
  39:16

**29**  19:2,3
  38:19,22

**2nd**  42:20
  43:17

**3**

**3**  8:9 9:15
  10:8 31:7,
  19 42:5,9
  43:20,23
  44:25

**3.33**  49:23

**30**  12:9,19
  20:4,5
  21:14
  22:18
  24:18

**31**  24:2,4,
  5,15

**32**  25:7,10,
  14 38:9
  41:1 42:9
  49:6

**33**  41:14,17
  42:5 46:6

**34**  41:14
  47:3 48:8

**35**  41:14
  48:11,12

**4**

**4**  8:9
  31:13,19
  36:11
  43:24

**Maxene Weinberg Agency,**
**a Huseby Company**

**5**

**5**  9:3
31:15,19
42:8,9,10
44:25
45:13

**6**

**6**  32:6,8,17
48:8

**6.00**  7:17

**6th**  15:22
16:15 18:2
19:4,10
45:22

**7**

**7**  7:25
25:22
32:21

**7.25**  45:13

**8**

**8**  7:25 36:8
47:4

**800**  11:16
15:7

**88**  36:11

**8th**  48:13,
17 49:7

**9**

**9**  33:15
37:6

**A**

**Absolutely**
35:6 44:23

**access**  38:12

**accurately**
34:13

**addition**
41:20

**additional**
15:3

**addressed**
12:25
32:14

**adjourn**
49:25

**administrative**
9:24

**advised**
33:16,20
42:22

**agree**  23:7
25:4

**agreed**  18:18
29:22

**ahead**  40:1

**allegations**
34:14,24

**alleged**
34:11,21,
24 35:12
44:5

**amount**  39:14

**analysis**
10:2

**Angeles**  45:6

**apologies**
44:4

**apologise**
35:10

**appearance**
7:15

**appearing**
7:12

**appears**
22:17 29:6
31:19
39:6,16
47:8 48:8

**Applications**
8:7

**Argumentative**
27:21

**arrested**
42:17

**assist**  28:25

**assistant**
18:8

**assisting**
9:25

**assume**  29:21

**assumes**
27:20

**assumption**
46:18

**attach**  46:1

**attached**
36:5 47:9

**attaching**
47:10

**attachment**
48:7

**August**  20:9
24:3,9
33:5,12
36:22

**B**

**back**  13:18,
20 26:15
28:12,13
29:3 30:7
35:23,24
41:11
46:5,6,16
47:15,17,
23 48:6
49:15

**background**
31:1

**Bank**  8:13,
15

**Barry**  7:22
28:18,19

MR. GREGORY WAUTHIER on 04/25/2018

**based** 33:17
37:22

**basic** 26:10

**basis** 12:10,
11,21
34:20
40:10

**beginning**
16:24
28:17

**benchmark**
13:9

**bit** 13:23

**board** 20:21

**Bogota** 32:4

**bottom** 25:25
43:23

**break** 41:7

**broker** 9:23
14:6 28:17

**brokers** 10:1

**brokers'**
47:24 48:7

**broking**
37:25 38:3

**BRS** 7:20,21
8:2 9:2,
10,21
10:21,23
11:3,15,
20,23
20:22 21:7
27:10

28:20
30:23
31:8,11,15
34:18
36:22
39:11
40:15,21

**BRS/I** 47:20

**BRUCCULERI**
8:20
13:18,24
17:4,21
27:11,15,
20 28:2
30:11,14
35:16,19
39:24
49:20

**building**
27:9

**business**
10:18

———————
C
———————

**Cadiou** 27:8,
19

**California**
25:9

**call** 13:9
40:5 49:1,
2

**called** 8:19

**calls** 21:20
39:25

**Central** 25:8

**CEO** 27:10,
13

**certificate**
18:19,20
19:19 20:7
21:17,22
23:4 24:8,
25 25:2

**certificates**
21:4

**cetera** 37:3
40:12 44:7

**challenge**
25:19 27:1

**challenged**
33:17

**challenges**
26:12,18
27:2 28:12
43:4

**change** 31:25
40:11

**changed** 9:17

**changing**
35:4

**characteristic
s** 14:18,22
38:21
39:15
40:20

**Charles** 30:6
47:13
48:12

**charterer**
37:16

**chartering**
36:11

**Charvet**
20:17,18
22:1,6
23:13
24:12,22
26:14
27:7,18
28:3,9
34:6,19
38:14
41:22 42:2
44:17
46:21

**circulation**
10:1

**circumstances**
46:25

**claim** 30:16

**clarification**
13:8 29:11

**Claudia**
23:20,21

**clear** 23:9

**clientele**
10:4

**clients**
11:7,9

**closely**
22:14

collaborative
  12:14
  44:18

colleague
  26:14
  41:21

colleagues
  12:17
  18:18
  19:17
  24:21
  27:18

Columbia
  32:2,3

comfortable
  10:14

commented
  47:15

comments
  46:16
  47:16

commission
  10:25

companies
  22:11

company  8:3,
  5,6,12,19,
  21 9:2,6,
  12,14
  10:24
  23:22
  27:14

compared
  18:17 44:4

comparison
  21:8

competitive
  22:12

confer  27:25

conferred
  27:18 28:9

confirm
  41:16

connection
  37:24 38:2

consistent
  37:16

consolidating
  21:3

constantly
  22:7,8

constraints
  7:14

contacted
  16:4

content  29:1

continues
  43:23

controller
  8:18

conversations
  22:16
  24:21

copied  42:3

copies
  16:18,19

17:6
49:13,17

copy  16:9
17:2,6
29:22
43:8,9,10
49:9

correct
28:22,23
30:23,24
31:2,3,5,
8,9,10,16,
17,20
33:19
39:2,3
44:14,15
47:10,11
48:8,9,23,
24

correctly
34:22

correspondence
30:16

cost  8:18

Counsel
30:11

couple  22:24
31:23

court  15:12
17:12 29:9

customarily
13:5

customers
11:12

D

Dalton  16:5

data  13:13
40:16

database
15:1 38:14
39:9,11,
21,22
40:2,4,10,
13,16,20,
21 44:6

databases
9:25 37:2

date  50:1

dated  15:22
19:10 20:9
24:9 48:13

day  22:15,
25 24:22
43:12
45:11,20
48:21

day-to-day
10:18 14:5

decided
49:25

declaration
25:7,8,18
26:3,4,6
27:17
28:1,16
29:7,22
33:21 34:1

**MR. GREGORY WAUTHIER on 04/25/2018**

35:3 36:1,
5 38:16
41:2
42:16,18
43:10,11
45:6 46:2,
7 47:9,10,
24 48:7
49:10

**declarations**
33:17

**deem** 13:12
14:15

**delivering**
45:17

**department**
10:23 12:1

**deposition**
10:15 35:3
49:25

**describe**
10:20

**describes**
30:22,25
31:8

**describing**
37:17

**description**
25:20
31:11
36:18
37:13
38:20 39:1

**detail** 22:19

44:5

**determined**
50:1

**develop** 10:3

**differences**
34:21
35:12 44:5

**direct** 12:9,
11,21 13:1
41:20,23

**directed**
13:2

**director**
12:22

**discrepancies**
33:18,23
34:11,24

**discussed**
19:16
22:24
38:13

**discussing**
21:20
22:25 23:1

**distance**
8:18,22,23
22:15

**District**
25:9

**document**
15:14,18
16:8,9,11,
13 17:23
18:5,10,24

20:11 21:1
25:15
28:25
29:9,24
30:8,21
33:4 36:8,
14,16,17
37:6 46:7
48:18

**documentations**
37:2

**documents**
15:3

**draft** 46:1
47:13,20,
24 48:3

**Draft/brokers'**
46:7

**duly** 7:2

**duties** 7:16
9:16,24
10:21

**duty** 10:24

---
**E**
---

**earlier**
18:16
19:15
41:16
43:7,13
47:9

**effort** 44:19

**elements**
14:14

**email** 29:24
30:2 32:14
33:10
41:18,25
42:10,19,
22 43:16,
18,22,25
44:13,24
45:21
46:5,21
47:9,23
48:12,19,
20 49:7

**emailed**
26:15

**emails** 41:14
42:11

**employed**
7:19 8:10

**employee**
9:17 11:25

**enables**
36:17

**enclose**
47:19

**enclosed**
47:20

**end** 17:10

**ends** 12:17

**English**
10:9,15,17

**enquired**
40:8

enquiry
48:23,25

ensure   23:2

EPW   25:11

Erich   16:8,
23 17:11

errors
33:17,22
34:25

evaluated
14:19

evaluating
13:5

EXAMINED   7:4

exchange
41:18

exchanges
41:14

Excuse   16:7

executed
49:5

exhaustive
36:18

exhibit
15:11,13,
16 17:20,
22 18:4
19:3 20:4,
5 21:14
22:18
24:1,2,4,
5,15,18
25:7,10,

14,22 36:7
39:16
40:25
41:1,2,17
42:5,9
46:6 47:2,
3 48:8,11
49:6

exhibits
36:5 38:19
41:14

explain   44:7

explained
27:4

explaining
34:20

explanations
34:18

extra   17:5

_____

F

facts   27:21

fair   23:2
40:4,5,6,
14,15,23

familiar
35:9

family   7:16
46:25

February
42:20
43:17
44:25
45:13,22

47:4
48:13,17
49:7

feed   40:11,
13

feeds   40:16,
20

feel   10:14
15:1

files   49:10,
13

filling   9:24

find   47:19

firm   7:23
10:23
29:7,8,10

flag   39:4
40:12

follow   13:5

foreign   21:7

forged   19:18

forget   10:9

forgotten
45:12

form   29:18,
20 36:20
37:18,20

format   29:6,
13,16 30:8
37:14

formatted
26:16

foundation
27:21

foundations
39:25

France   8:19

Frank   17:9

French   8:12
10:13

_____

G

G-r-e-g-o-r-y
7:9

gave   16:23,
25 17:9
26:18
49:1,2,12

generate
10:25

give   44:21
45:5

giving   10:14

gossip   13:15
14:2

Gregory   7:1,
7,9

group   15:21
16:2,3
19:10 20:8
24:9 31:8

guess   26:4
29:5 39:13

guys   49:21

| | | | |
|---|---|---|---|

**H**

half  7:25

hand  35:10, 11

handed  16:12 38:22

happy  47:20

hard  29:22 49:12,17

head  27:9

heading  29:7 39:17

headquarters 9:5

heard  42:15

higher  13:23

highlight 44:10

hitting  21:7

hmm  23:11 45:8 47:1

holiday 22:20

Honami  15:22 16:16 17:24 18:2 20:8 23:4 24:16 32:16 33:12 34:20

38:11 39:2,16 41:5

hospital 45:17

**I**

idea  14:11

identification 15:16 19:3 20:5 24:4 25:10

identified 16:15

include 38:20 39:22

includes 37:7

inclusive 22:13

independent 10:3

industry 36:16 37:15,24, 25 38:3,6

information 14:2 31:4, 14,15,18, 20 37:4,7, 19 39:6,8, 15,19,23 40:3,4,22

input  44:21

inspect 15:4,9

instructions 32:10,12 33:6,9

interest 14:10

intermediary 11:1

international 11:12

interrupt 30:12

Intertanko's 36:10

investigate 14:17,21

involved 28:7

involvement 24:14

issuance 12:2 21:3

issue  42:23

issued 19:10,18 20:8 24:9

issuing 21:10

items  27:25

**J**

JAMIESON 29:17 35:22

job  10:7

junior  9:23

**K**

kind  8:20

KLEIN  16:7, 12,17,21 17:2,5,24 25:11

knew  42:17

knowledge 13:16 14:8 37:3

**L**

La  8:19

lacks  27:21 39:24

language 10:10,12

large  11:11

law  29:9

leave  7:17 12:15

led  44:20

left  49:18

lenders
  11:12

levels  14:4,
9

life  14:5

list  26:12

listen  40:18

listened
  40:17

litigation
  42:15

Lloyd's
  40:4,5,6,
  14,15,19,
  23

located
  28:22

London  7:20
  8:13 9:1,4
  21:4,5

long  7:24
  8:8 10:5,7
  20:22

looked  26:13
  27:2 32:21
  34:1 38:9,
  15

Los  45:6

Loukopoulos
  33:21 34:1

Loukopoulos's
  34:23 35:2
  43:9

**M**

made  32:23
  43:4 46:16

MAI  39:4

make  48:2

making  48:22

managing
  20:21

mark  19:1
  20:3 24:2
  25:6

marked
  15:11,16
  17:22 19:3
  20:5 24:4
  25:10
  41:13

market  9:25
  10:1 13:15
  14:2,7,10
  23:1 24:23
  37:2 38:15
  40:12

material
  27:4 33:18
  34:21
  35:12,13,
  18,19,20
  36:2

Meaning
  24:19,20

means  10:24
  12:13 14:8

meant  13:21

Megacore
  15:21
  19:9,25
  20:8
  24:10,16,
  17 32:15
  33:11,12
  34:12 37:8
  41:4

member
  20:19,21

members
  21:10

memorable
  45:11,20

mentioned
  18:16
  19:15

message  43:3

messages
  41:20,23

million
  18:22
  19:9,24
  20:9 23:6
  24:11 25:3

mind  13:25

minutes
  49:22

missed  35:16

Mmm  23:11
  45:8 47:1

moment  17:13

move  25:6

moving  9:4

**N**

names  40:11

Natixis
  8:13,15

negotiated
  14:4

negotiations
  13:17

Nicos  22:1,
  5,20

notice  42:25

number  25:22

**O**

objection
  27:20 28:2
  39:24

occasions
  22:25

October
  15:22
  16:15 18:2
  19:4,10

office  8:13
  12:15
  21:3,4,5,
  8,24,25
  22:3,4,11,

12,23
23:16
24:22

offices
22:10
31:24 32:1

on-going
13:16

opened  32:2

opinion
18:17
19:16

opinions
21:9

order  19:2
20:3 49:17

organism
40:9

organized
49:21

original
48:3

output  12:16

overlapping
40:2

overlooked
27:8

owner  37:15

owners  11:13
26:13
33:16
37:19
42:22

―――――――――
P
―――――――――

pack  16:23

paragraph
30:22
31:7,11,
13,14
32:5,8,17,
20 33:15
34:7

paragraphs
31:5,19
34:8,9,13,
17,22

Paris  9:3,5
18:8,18
20:20
21:2,9,10,
20,24,25
22:4 23:16
24:21

part  27:12

participate
12:1,16
21:12

participation
21:16

partner
9:12,13
28:17

partners
20:21

past  22:6

Pause  25:12

people  11:23
12:3,16

percentage
11:17

person  12:24

personally
12:22
38:12

Philomena
19:4,9
20:1 24:3,
10,17
32:15
33:12
34:12 37:8
38:10

phone  38:14

phrased
27:22

Play  40:5,
7,14,15,24

pm  7:17
17:16,18
41:8,10
49:23

point  26:10
27:3 28:7
34:2,3,5,
10,11,19,
20

points  13:13
44:11

Pole  8:6

position
8:18 9:9
30:23

positioning
23:1

potential
30:16

potentially
28:10

preceding
13:20
35:24

preliminary
10:6

preparation
24:14

prepare  18:5
19:12 26:4
33:4 44:2

prepared
26:3
36:21,22
43:24
44:8,16
45:5

preparing
27:17,24
28:25
33:2,11
38:8,16

presented
29:9,15

presently
10:21

Index: previously..remember

**previously**
 32:23

**printed**
 23:16 29:7

**prior** 42:21

**privileged**
 30:17

**procedure**
 13:4

**proceedings**
 45:6

**process**
 13:6,22
 19:15
 23:15

**pronounce**
 28:18

**properly**
 32:18

**provide** 15:9
 32:24
 37:19

**provided**
 15:20
 16:18
 30:15 33:9

**provider**
 40:23

**providing**
 8:4

**purchase**
 10:22 11:1
 12:1 14:5

**put** 18:19
 21:21
 23:2,4
 24:25

**puts** 23:4

---

**Q**

**Q88** 36:11,
 20,24
 37:10,18,
 20,21
 38:10
 39:7,9
 40:3 41:4
 44:6 48:23

**Q88s** 37:23
 39:23

**quarterly**
 40:10

**question**
 26:11
 29:18
 39:14
 40:18 45:1

**questionnaire**
 36:11

**quote** 32:18

---

**R**

**range** 11:11

**rarely** 40:8

**read** 13:18,
 20 32:13
 35:23,24
 46:15

**reading** 35:2

**reason** 21:2
 23:17
 30:15 36:2

**receipt**
 42:21
 46:13

**receive**
 23:19
 26:18 32:9
 43:10
 46:10
 48:17,18

**received**
 21:18
 25:19
 26:11,25
 43:3,8,9
 48:16 49:6

**recess** 17:17
 41:9 49:24

**recognize**
 25:15
 41:18

**recognized**
 36:17
 37:14

**recollect**
 18:15
 46:19
 48:3,4

**reconcile**
 44:7

**record** 7:6
 17:13,15,
 16,18
 41:8,10,11
 49:23

**Redoute** 8:19

**Reed** 26:20,
 22,24
 28:14,24
 29:21
 33:16
 41:15
 49:16

**refer** 9:23
 13:14
 37:1,5

**referred**
 13:11
 41:15,25

**referring**
 16:8,10

**refers** 13:11

**reflected**
 24:15

**reformatted**
 29:24

**regularly**
 11:20

**relevant**
 14:15 37:1

**remember**
 22:16

23:24
29:20
46:14
49:11

**renewed**
47:20

**repeat** 27:11
37:12

**replied**
34:14

**replies**
26:15
28:11

**reply** 34:2,
5,10 38:16

**reporter**
13:8 15:12
17:12
29:11

**reports** 9:25

**represent**
34:9,10,17

**representative**
49:16

**request**
12:25 13:2
15:24
21:6,7,19
23:14,19
32:18,19,
23 42:16

**respect**
18:21
21:17

23:12
27:25 33:6
36:20

**respond**
43:17
45:9,14
48:25

**response**
34:23
43:24 44:3
46:21 47:8

**responses**
44:14,16

**responsible**
12:23

**rest** 44:13

**retain** 49:9

**review** 33:21
43:4 46:2

**reviewed**
43:16
46:15
47:12

**Ritsos** 22:2,
20 28:6,10

**Rogliano**
7:22 28:19

**roughly** 12:2

**routinely**
38:6

**run** 9:20

—————————
S
—————————

**sale** 10:22,
25 12:1
14:5,9
20:19 27:9

**sales** 13:10

**Salles** 7:23
28:19

**seeking** 37:3

**selling**
8:19,21,
22,23

**send** 30:4
49:14

**senior** 9:25

**sentiment**
24:24

**sentiments**
22:25

**separate**
39:10

**service**
37:21,22

**services** 8:4

**set** 10:3
13:21,22
40:15

**shared** 19:15
21:19

**ship** 11:13
14:24

15:1,2
39:16

**shipbroking**
7:23 10:23
13:10
22:10

**shipping** 8:4

**shipping-
related**
14:14

**ships** 10:1
11:1 13:17
14:3,8,18,
22 37:17
38:3

**show** 18:20

**shown** 18:10
21:13

**sic** 13:7

**side** 37:16

**sign** 29:12,
23 49:6,14

**signature**
18:24
19:21
20:13
25:24

**signed** 15:21
19:10
20:15 21:1
23:16
24:11
29:23
49:10,17

**MR. GREGORY WAUTHIER on 04/25/2018**

**signed-off**
  23:13

**significance**
  36:20
  37:10

**signing**
  21:11

**similar**
  13:12

**similarly**
  39:13

**single**  12:14

**Sir**  7:5

**sit**  10:22
  21:4

**sitting**
  22:23

**situation**
  24:24

**small**  8:3
  23:20,21

**Smith**  26:20,
  22,24
  28:14,25
  29:21
  33:16
  41:15
  49:16

**sort**  26:9

**Sounds**  45:11

**source**  40:3

**Space**  8:7

**speak**  10:17
  13:23

**specific**
  37:4

**specifically**
  18:14
  29:20

**speculation**
  39:25

**spell**  7:8

**spent**  9:3

**stage**  27:8

**stamp**  25:11

**standard**
  36:10,17

**stands**  7:22

**Star**  8:7

**start**  9:22
  49:22

**started**  9:2,
  21

**starting**
  28:16

**starts**
  43:20,22

**state**  7:5
  34:14,23
  36:1

**steps**  18:16
  19:14

**stone**  13:7,
  22

**string**
  41:18,25
  42:1,11
  45:22  46:6
  47:24

**strongly**
  20:16
  40:23

**submitted**
  25:7,8
  38:17

**subscription**
  37:22

**subsequently**
  49:25

**subsidiary**
  8:13

**substance**
  28:16  30:1
  44:13
  45:22

**substantial**
  39:14

**Sue**  16:5

**summarize**
  13:16

**sworn**  7:2

**system**  22:13

_____

**T**

_____

**taking**  42:22

**talk**  21:9,
  23  22:15,

  22  49:3,21

**talked**  21:25
  22:1,21
  24:23

**talking**  27:6
  36:24

**tanker**
  36:10,25
  37:13,15

**tankers**
  11:18,21

**team**  20:20
  21:10,19

**technical**
  8:4

**terms**  9:16
  35:5

**testified**
  7:3  43:8

**Thierry**
  20:17,18
  22:1,23,24
  24:22
  26:14
  34:6,19
  38:13
  41:21
  44:17

**thing**  31:24

**third-party**
  11:6  40:22

**thought**
  16:25  17:8

Index: time..word

time  7:14
 9:9,18
 10:2 19:16
 21:5,6
 22:21 23:5
 24:17
 42:14,18
 46:25

TMF  16:2,3
 23:23
 32:10,24
 33:5,10

today  7:12,
 15 10:15

told  45:16

top  36:9
 37:2 47:3
 48:11,12

trigger
 14:10

true  31:4

type  11:11
 15:2 26:5,
 6,10

―――――――――
        U
―――――――――

ultimately
 29:8

unavailable
 46:24

understand
 26:8 29:17
 33:8 37:11

undertake
 9:23 15:23
 18:9,12

units  13:12

updating
 40:10

―――――――――
        V
―――――――――

valuation
 12:13,14
 15:9,20
 16:16
 18:3,10,
 13,15
 19:4,8,13,
 23 20:7
 21:6,7,13,
 18 22:17,
 22 23:7
 24:3,8,15,
 24 25:1,4
 33:22
 34:25
 35:4,5,15
 39:17 43:5

valuations
 11:3,10,
 14,21,24
 12:2,5,18
 23:15
 32:21,24
 33:2,4,7,
 11 36:21
 37:24
 38:3,9
 42:23

valued  14:23
 35:8

values  14:12

valuing
 14:15

version
 36:11

vessel  13:5
 14:15
 15:9,21
 19:9 20:8
 21:13
 24:10
 34:12,20
 35:8,9,15
 36:18,23
 37:4,7,13
 38:7,21
 40:20 41:4
 42:17

vessels  11:4
 15:4 24:23
 25:20
 32:22,25
 35:9 38:21
 40:11,12

view  30:17

voluntarily
 7:12

―――――――――
        W
―――――――――

W-a-u-t-h-i-e-
 r  7:10

wanted  21:21

water  40:17

Wauthier
 7:1,7,9,11
 24:5 41:13

Web  37:22

Weller  30:6
 41:19,21
 42:1,2,11,
 20 44:21
 46:11
 47:13
 48:13

Weller's
 43:25
 46:21

wife  45:17

WISE  7:4,5
 8:25 11:2
 14:16
 15:13
 16:10,14,
 19,25
 17:8,14,
 19,23,25
 25:13
 27:16,23
 28:4 29:25
 30:13,19
 35:25 40:1
 41:6,11
 49:19

WOOD  16:22
 17:10

word  35:16,
 20

**MR. GREGORY WAUTHIER on 04/25/2018**

```
work   8:8
  10:6 12:13
  22:5,14
  31:1,15

worked   7:24
  8:2,3 9:1
  20:22
  34:2,4

working   10:1
  29:21

world   13:10

wrong   43:13

wrote   28:11
```

---

**Y**

---

```
year   11:15
  12:8 15:7,
  8

years   7:25
  8:9 9:3,15
  10:8 18:15
  20:24
```